BOUKER CONTRACTING CO. v. PROCEEDS OF SALE OF DREDGING MACHINE (MORRISON DREDGING CO., Claimant).

(District Court, D. New Jersey. March 4, 1909.)

1. MARITIME LIENS (§ 69*) — POWER OF COURT — DISPOSITION OF PROCEEDS OF VESSEL SOLD.

Where a court of admiralty has seized and sold a vessel in proceedings in rem, any surplus proceeds remaining after lien claims have been paid belongs to the owner of the vessel, and the court has no power to distribute the same to general creditors having no liens.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 107; Dec. Dig. § 69.*]

2. MARITIME LIENS (§ 9*)—MARITIME CONTRACT—HIRING OF SCOW.

A hired scow, on which a dredge was temporarily mounted while being used to unload material from boats and deposit the same in the space behind a private bulkhead, which was being filled in, was not employed in a maritime service, nor was the contract of hiring maritime; and the owner, in the absence of a contract therefor, has no lien upon the dredge or its proceeds for the hire.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 13; Dec. Dig. § 9.*]

In Admiralty. On petition for proceeds.

Linsly Rowe, for petitioner.
Foley & Martin, for claimant.

CROSS, District Judge. The petition sets forth that the petitioner intervenes for its interests in the proceeds of a dredging machine now in the registry of this court; that the petitioner is a corporation of the state of New Jersey, engaged in maritime contract work in and about the bay of New York; that the dredging machine above mentioned was owned by the Morrison Dredging Company, a corporation of New York, which was engaged in the business of dredging out or filling in of channels or other water ways in and about the harbor of New York and adjacent waters; that in the month of December, 1906, the Morrison Dredging Company hired from the petitioner one of its scows, known as "No. 22," took possession of the same on December 16, 1906, subsequently erected and placed thereon said dredging machine, and agreed to pay a reasonable price for the rental and charter of said scow while it was used by said dredging company; that the

scow was in the possession of said dredging company, with the dredging machine on board, and was used and employed by said dredging company in its business, from December 16, 1906, until February 20, 1907, inclusive (Sundays not being charged for), a period of 58 days; that the reasonable price and value for the use and charter thereof was $7 per day, and that the total amount due the petitioner for the hire of said scow, was $406, no part of which sum had been paid, although payment thereon had been demanded; that on February 20, 1907, both the scow and dredging machine were attached by the United States marshal for this district, under a monition issued out of this court upon a libel for contract filed by the Merritt & Chapman Derrick & Wrecking Company; that such proceedings were had under said libel and others subsequently filed; that the said dredging machine and scow were separately sold by the marshal April 19, 1907, under a writ of venditioni exponas issued out of this court; that the proceeds of sale of said dredging machine amounted to $1,725, which sum was duly paid into the registry of this court, where it remains undistributed; that the contract for the hiring and charter of said scow was a maritime contract; that the petitioner is entitled to have the amount due thereunder paid out of the proceeds of the sale of the said dredging machine, and that all and singular the premises are true, and within the admiralty and maritime jurisdiction of the United States and of this honorable court.

The claimant by its answer, among other things, sets up that the petitioner has no lien against the proceeds of sale of the dredging machine by virtue of any of the matters or things set forth in its petition. The foundation of the petitioner's claim has already been stated. The claimant denies that it hired the scow, and, on the contrary, says that it came into possession of it under a contract of sale, by the terms of which the title was to remain in the petitioner until the purchase price was fully paid, during which time, however, the claimant was to have possession, subject to the right of the petitioner to keep a man on board of the scow at the expense of the claimant. If a conditional sale were made, as the claimant alleges, the petitioner is manifestly not entitled to hire for the use of the scow; but it is unnecessary, in my judgment, to consider that aspect of the case, because under the evidence, and accepting the petitioner's view that the scow was chartered, I have reached the conclusion that the petitioner is not entitled to a decree. I am unable to perceive any lien or right of lien that the petitioner had or has upon the dredge, or the proceeds of sale thereof. It is nowhere claimed that such right exists by reason of any contract. The petition is silent upon the question. It neither asserts the existence of such a lien, nor sets up facts from which one might be inferred. The petitioner merely asks to be paid its claim out of the proceeds of sale of the dredge in the registry of the court, as if to ask were to receive.

Beyond question the petitioner cannot obtain any of the moneys it seeks unless its claim constituted a maritime lien, capable of enforcement by a proceeding in rem against the dredge. The petitioner seems to have proceeded upon the theory that as a general creditor of the Morrison Dredging Company, in the absence of creditors having liens, it had the right to have its claim for the hire of the scow paid out of

the proceeds of sale of the dredge. The authorities, however, do not support, but are absolutely opposed to, that view; for instance, in The Lottawanna, 87 U. S. 201, 221, 22 L. Ed. 259, the court says:

"Beyond doubt, maritime liens upon the property sold by the order of the admiralty court follow the proceeds; but the proceeds arising from such a sale, if the title of the owner is unincumbered and not subject to any maritime lien of any kind, belong to the owner, as the admiralty courts are not courts of bankruptcy or of insolvency, nor are they invested with any jurisdiction to distribute such property of the owner, any more than any other property belonging to him, among his creditors. Such proceeds, if unaffected by any lien, when all legal claims upon the fund are discharged, become by operation of law the absolute property of the owner. * * * Decided cases may be found which afford some support to the proposition that the proceeds in the registry of the court, if the lien claims are all discharged, may be distributed equitably among the intervening creditors of the owners; but the court is of the opinion that the rule that the proceeds in that state of the case belong to the owner is correct in principle, and that the weight of authority is in its favor, notwithstanding those cases, of which The John, 3 Robinson, 290, is the one most frequently cited."

Other cases from the many holding the same doctrine are The Wyoming (D. C.) 37 Fed. 543; The Willamette Valley (D. C.) 76 Fed. 838; The Balize (C. C.) 52 Fed. 414; The Lydia A. Harvey (D. C). 84 Fed. 1000. In The Balize, supra, the facts were that a tug had been sold to satisfy certain maritime liens, which having been discharged, there remained in court a surplus which was claimed by both the former owner and his creditors. The creditors, who petitioned that the fund be paid to them, were of two classes—those claiming for supplies furnished to boats other than the tug, for which suits in personam were pending, and those claiming for services rendered as master of the tug and of other boats, for which judgments in personam had been obtained and executions returned nulla bona. Jackson, Circuit Judge, on appeal from the District Court, held that the suits and judgments in personam conferred no vested right on the master of the tug, or other petitioning creditors, to a specific interest in the surplus such as the forty-third admiralty rule contemplates, and that therefore the District Court had no jurisdiction in admiralty to create liens on the surplus as against the former owner. In the course of its opinion the court said:

"Neither the master of the Balize nor any of the other petitioning creditors had any specific lien upon the Balize or its proceeds, either by statute or by contract. The District Court, as an admiralty court, has no jurisdiction to create liens on this surplus as against the owner. It can only assert and enforce against the owner prior specific liens which the owner or the law have previously created or established. The judgments which the several masters have obtained against the Detroit Tug & Transit Company (the former owner of the tug) in personam, the issuance of executions, and returns of nulla bona thereon, created no lien on said surplus. The suits and judgments in personam conferred no vested right to a specific interest in said surplus, such as the forty-third admiralty rule contemplates. The creditor who claims satisfaction out of surplus proceeds in such cases must come into court with an existing specific lien. He cannot invoke the aid of a court of admiralty to create such lien by attaching or impounding the fund. The admiralty court can only enforce or give effect to subsisting liens created by statute or contract as against the owner of surplus proceeds. It may be, and doubtless is, inequitable for the owner to assert its right to this surplus, and leave bona fide

debts unpaid; but a court of admiralty has no such equitable jurisdiction as will enable it to correct such a wrong. The claim of the master of the Balize cannot be distinguished from that of the other creditors, and the decree of the District Court allowing and directing its payment is reversed."

The law, however, is summarized in a single paragraph in The Edith, 94 U. S. 518, at page 523, 24 L. Ed. 167, where Mr. Justice Strong, speaking for the court says:

"It need hardly be added that, though a proceeding in rem and a petition for payment of a claim out of proceeds of a sale remaining in the registry are distinct things—the former proceeding on the ground of a lien—yet no one except an owner is entitled to payment out of the registry, unless he has a lien upon the fund therein. The court can marshal the fund only between lienholders and owners."

The evidence shows that scow 22 came into the possession of the claimant on or about the 16th day of December, 1906, loaded with dirt; that the claimant had been in the habit of receiving from the petitioner scows thus loaded, and of unloading them and using the material with which they were laden, in the execution of a contract which it had with the New York Central Railroad for the filling in of some property lying back of a bulkhead at Kingsbridge, on the Harlem river, near 192d street, in the upper part of the city of New York. The dredge referred to, which consisted of an A frame, boom, and engines, with a house over it, had been up to that time, and was for about two weeks thereafter, used as a land dredge; that is to say, it was located on the land and used for unloading scows into the depression which was being filled. Mr. Bouker, the chief witness for the petitioner, speaking of the business of the Morrison Dredging Company, the claimant says that so far as he knew "the only business they were engaged in was the filling in of some property at Kingsbridge with dirt and ashes," etc., and his testimony upon the point is in harmony with all of the other testimony in the case, which, briefly summarized, is to the effect that the claimant during November and December, 1906, and January, 1907, was engaged in the work of constructing the bulkhead above mentioned and filling in the space back of it with earth and other material, and that the scow was hired to be used, and was used, on that work. It has already been stated that the dredge was used upon the land for unloading scows until January 1st, when it was transferred to scow 22. The work of transfer and of installation upon the scow occupied about three days, and after the dredge was thus installed it so remained until it was seized by the marshal. Still it was not in use throughout the entire intervening period, for the reason that on January 28th the barge and the dredge both sank, to the extent that they were partially submerged. They were raised, however, on February 9th by the Merritt & Chapman Dredging Company, and towed to Hoboken for repairs, where on February 20th they were seized by the marshal and subsequently sold as above stated.

From what has been said, it appears that the dredge was in actual use on the scow at the most but for 24 or 25 days, and it may be added that the character of its use during that period was, as above indicated, and not otherwise. There is no evidence of any agreement for a lien upon the dredge. The dredge and the scow were separate

entities, had different owners, were sold separately, and are treated separately in the petition. The one was never permanently affixed to the other. The dredge was no part of the tackle, furniture, or freight of the scow, if, indeed, that be material under the circumstances. It never became a part of the scow. It was used on the scow for a short period, but not at any time in a maritime service. Its use while afloat was not different than it had been while on the land. In both cases it aided in unloading material for filling in a depression behind a bulkhead. It could doubtless be moved more readily while afloat, but the area of its movement was at all times circumscribed by the bulkhead. Neither it nor the scow was, during the charter, engaged in maritime work. There is no evidence that the scow or the dredge were either of them ever outside of the bulkhead after the scow was chartered, except when they were taken away for repairs, after they had been sunken and raised. The construction of the bulkhead was apparently a private matter, and there is nothing in the case from which it might be inferred that in any sense or to any extent it was an aid to commerce or navigation.

In re Hydraulic Steam Dredge, No. 1, 80 Fed. 545, 25 C. C. A. 628, is to some extent illustrative of the case at bar. At page 556 et seq. of 80 Fed., and page 639 et seq. of 25 C. C. A., Judge Jenkins, speaking for the Seventh Circuit Court of Appeals, said:

"Upon the assumption that the structure in question is a ship or vessel, and within the admiralty jurisdiction, that jurisdiction will not be asserted to enforce a contract touching the ship, unless such contract is maritime in its nature. Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90. The admiralty deals alone with things pertaining to the sea. We declared in The Richard Winslow, 34 U. S. App. 542, 18 C. C. A. 344, 71 Fed. 426, that 'a maritime contract must therefore concern transportation by sea. It must be one of navigation, and commerce on navigable waters.' It was there pointed out that not every contract having reference to a ship is within the admiralty jurisdiction, but only such as relate to maritime employment, such as pertain to the navigation of a ship or assist the vessel in the discharge of a maritime obligation. It is not enough that the service is to be done upon the sea or with respect to the ship. It must relate to trade and commerce upon navigable waters. The coals furnished by libelant were supplied to the dredge while it was engaged in its work for the Illinois Central Railroad Company, and to enable it to perform that work, which was 'to fill in earth for its railroad purposes behind a line of piling on its grounds on the lake front in Chicago.' By means of its cutting apparatus, the earth on the bed of the lake was dug up, loosened, and disintegrated, and, with the adjacent water, sucked up into and through a centrifugal pump, and thence discharged through a continuous line of adjustable pipes to the place of deposit upon the adjacent shore. This is not a maritime employment. The fact that the dredge floated upon navigable waters is not controlling. The dredge in the performance of that contract was not engaged in navigation, nor even in the marine transportation of the earth dug from the bed of the lake. To the contrary, a peculiar mechanism dispensed with the necessity of marine transportation. The employment related solely to the land—to the creation of an embankment upon the land for the use of a railway upon the land. The only possible relation to the sea in this employment was in this: That for the purpose of obtaining the earth, and as a necessary incident thereto, the bed of the lake was dug out, and thereby the channel was deepened. That was not, however, for the purposes of navigation. It is not suggested that vessels engaged in navigation frequented the place, that wharves were constructed or designed, or that the excavation was for the purpose of or in aid of navigation. The work was done in and for the construction of an embankment upon the land, and for railroad purposes."

In the case of Cleveland Terminal & Valley Railroad Co. v. Cleveland Steamship Co., 208 U. S. 316, 28 Sup. Ct. 414, 52 L. Ed. 508, it appears that a libel was filed in the court below upon a claim for damages caused by a vessel to a bridge or dock in navigable waters. The libel was excepted to. Upon the hearing the District Court sustained the exception, and dismissed the libel, "on the ground that although the property injured by said disaster, said dock, said center pier, and said protection piling work, stood in the navigable water of said river, yet it does not appear, from the allegations of the libel, that any part of said property so injured was either an instrument of or an aid to navigation, for which reason there is no authority for sustaining the jurisdiction of a court of admiralty over the wrong complained of, and the cause of action set forth in the libel." The decree below was affirmed by the Supreme Court. See, also, The Pile Driver, E. O. A. (D. C.) 69 Fed. 1005; The Pennsylvania, 154 Fed. 9, 12, 83 C. C. A. 139.

Because, therefore, the petitioner had no lien or right of lien against the dredge, it has no claim to the moneys in the registry of the court.

The petition will be dismissed, with costs.