## THE W. T. BLUNT.

## TIEDTKE BROS. CO. v. SHIRLEY-SKELDON DREDGING & SUBMARINE CONTRACTING CO. (WHITING et al., Interveners.)

(District Court, E. D. Michigan, S. D. August 9, 1923.)

### No. 6111.

1. **Maritime liens ⊙⇒60—Jurisdiction dependent on question whether contracts were maritime.**

Admiralty jurisdiction, when invoked to enforce alleged maritime liens, depends on question whether the contracts involved were maritime contracts.

2. **Admiralty ⊙⇒10—If contract has direct or substantial relation to navigation, it may support jurisdiction of admiralty; "maritime contract."**

If contract pertains to maritime service or maritime transaction, that is, if it has direct or substantial connection or relation to navigation, it is "maritime" in nature and may afford sufficient basis for jurisdiction of court of admiralty.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Maritime Contract.]

3. **Admiralty ⊙⇒10—Contract not pertaining to navigation not enforced in admiralty though referring to vessel; "maritime contract."**

If contract has no direct or substantial connection or relation to navigation, even though it refers to a vessel, as, for example, if it does not tend to enable or aid the vessel to engage in navigation, it is not a maritime contract, nor enforceable in court of admiralty.

4. **Admiralty ⊙⇒14—Contracts to furnish supplies and render services not enforceable in admiralty when dredging was being done in interest of dredge and not of navigation.**

Where, at time supplies were furnished dredge and services were rendered by members of crew, it was engaged in dredging small creek or marsh to afford better drainage and not to make it suitable for navigation, the contracts had no relation to navigation and were unenforceable in admiralty, whether or not dredge was vessel within meaning of maritime law.

In Admiralty. Libel by the Tiedtke Bros. Company against the dredge W. T. Blunt, her engines, etc., claimed by the Shirley-Skeldon Dredging & Submarine Contracting Company, in which Charles Whiting and others filed intervening libels. Libel and intervening libels dismissed.

Warren, Cady, Hill & Hamblen, of Detroit, Mich., for libelant and intervening libelants.

Miller, Canfield, Paddock & Stone, of Detroit, Mich., for claimant.

TUTTLE, District Judge. The libel and intervening libel herein each claims a maritime lien against the respondent dredge for sums alleged to be due for supplies and services, respectively, furnished to said respondent. The libels aver that said dredge is a vessel engaged in the business of commerce and navigation. It is also alleged that the supplies were necessary to enable the respondent to continue in the business in which she was then engaged, and that the services were rendered by the intervening libelants as members of her crew. The

answer asserts that this court is without jurisdiction in the premises, as said dredge is not the subject of admiralty jurisdiction, and that the contract on which each libel is based is not maritime in nature and hence not within the cognizance of a court of admiralty. Whether the case is within the admiralty jurisdiction of this court is the question presented for decision.

The cause has been submitted to the court on a written stipulation of agreed facts as follows:

"(1) The Shirley-Skeldon Dredging & Submarine Contracting Company was at all times heretofore mentioned a corporation of the state of Ohio, having its principal place of business at Toledo, Ohio.

"(2) Said dredge W. T. Blunt at the time of the furnishing of the supplies as mentioned in said libel, and during the times of the performance of the labor as mentioned in said intervening libel, was lying in Woodchuck creek, Monroe county, Mich.

"(3) Said dredge was built by the American Shipbuilding Company at Lorain, Ohio, and was launched in about 1914. Its hull is of steel; its length 50 feet; its beam 15 feet; and its draft 3½ feet. Shortly after it was built it was towed to Toledo, where it was equipped with a boiler, engine, and machinery for the operation of a dredge dipper used in digging material under water. It had no sails or other means of propulsion, no rudder, and cannot be moved from place to place except by being towed, but it was at all times operated afloat. It was never registered, enrolled, or licensed.

"(4) Prior to the work at Woodchuck creek, the dredge was on the Maumee river in the work of constructing a high-pressure water main running under said river; said water main having been laid at a depth of 18 feet below mean lake level, and the bed for this main having been dug by the dredge W. T. Blunt. Prior to this work, it had at times been engaged in digging material, under water at Cedar Point, for use in constructing an automobile toll road leading to Cedar Point, and also at Toledo Beach, Mich., in digging material used in raising and leveling the adjacent shore line of Lake Erie and land running back a short distance in the vicinity thereof; the facts as set forth in this paragraph, however, being objected to by respondent as immaterial.

"(5) At the time of the filing of the libel and intervening libel herein, said dredge was employed by the drain commissioner of Monroe county, Mich., in drainage work in Woodchuck creek, which prior to such work was a small meandering stream, and towards the mouth, say from about claim No. 64 (on the map), it was a marsh, and during the spring thaw, and rains the marsh being possibly 50 feet wide, and in the summer and fall practically dry. This portion, from claim 64 to the mouth, about one mile, was the part which was to be dredged out by the claimant. The balance of the drain was to be cleared out and improved by teams and men. The job for which said dredge was employed was to afford better drainage in the vicinity of said creek, and not for the purpose of deepening the creek to make same suitable for navigation. Said work was done by dipping the earth and sand away from the bottom and sides of Woodchuck creek and depositing said earth and sand on the banks of said creek. Woodchuck creek, after the work in question was completed, had a depth of about 5 feet and a width of about 20 feet.

"(6) To reach its place of work at Woodchuck creek, the dredge was towed over the navigable waters of Lake Erie and was returned in the same manner. During the work it was cut off from the mouth of the creek by a dam or dams which were moved up behind it as the work progressed, the dredge digging its way up the creek, and after the work was completed, the dredge kicked itself back into the lake, where it was towed by tugs fastened to the stern. A high-tension electric cable across the creek was necessarily removed to permit the dredge's ingress and egress.

"(7) Said dredge was operated by a force of about five men, working en-

tirely on the dredge as follows: An engineer, who was in charge of the engines of said dredge; a cranesman, who operated the dredging dipper; a fireman; a deck hand, who did general work about the dredge; and a cook. Said force or crew slept and ate aboard said dredge; proper accommodations for such purpose being provided, as said dredge had a galley, a messroom, and two sleeping rooms, in each of which were double bunks. When being towed on the navigable waters of Lake Erie, the fireman and, dipper operator ordinarily remained on board; the rest of the crew, however, going by land. The dredge carried no master or mate, the engineer usually being in charge. It was capable of carrying fuel and supplies for its own use, but for a short period only.

"(8) The supplies mentioned in the libel were not put aboard said dredge by libelant, but part of the supplies, to wit, groceries, were on the order of the owners of said dredge or their agents duly authorized, placed aboard a freight car in the city of Toledo consigned to said dredge, and the balance of the supplies, to wit, meats, were called for by the owners or their agents and delivered to them at the place of business of said libelant at Toledo.

"(9) The said libelant furnished said dredge with the supplies as set forth in the libel on the credit of said dredge. Libelant did not know the kind of work the dredge was engaged in during the times in the libel mentioned."

[1-3] The admiralty jurisdiction of this court having been invoked for the enforcement of alleged contractual obligations for the recovery of which a maritime lien is claimed, whether the court possesses such jurisdiction depends upon the question whether the contract involved in each libel is a maritime contract, which question, in turn, is to be determined by inquiry as to the subject-matter thereof. If a contract pertains to maritime service or a maritime transaction, that is, if it has a direct or substantial connection or relation to navigation, it is maritime in nature and may afford a sufficient basis for the jurisdiction of a court of admiralty. On the other hand, if such contract is not so related to navigation, even though it refers to a vessel, for example, if it does not tend to enable or aid a vessel to engage in navigation or otherwise pertain to navigation, it cannot be properly termed a maritime contract nor be enforced in a court of admiralty. North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co., 249 U. S. 119, 39 Sup. Ct. 221, 63 L. Ed. 510.

[4] In the case at bar, the facts already set forth show clearly and beyond all doubt that at the time of the furnishing of the supplies and services in question this dredge was not engaged in or about navigation and that such supplies and services, and consequently the contracts under which they were furnished, were not necessary nor appropriate to enable or aid said dredge to engage in navigation or commerce, or in or concerning any act or transaction of a maritime character. Plainly, such contracts had no relation to navigation, and the enforcement thereof is not within the scope of the admiralty jurisdiction of this court. In re Hydraulic Steam Dredge No. 1 (C. C. A. 7) 80 Fed. 545, 25 C. C. A. 628; Bouker Contracting Co. v. Proceeds of Sale of Dredging Machine (D. C.) 168 Fed. 428; South Florida Dredging Co. v. American Steel Dredge No. 77 (D. C.) 286 Fed. 454.

It therefore becomes unnecessary to consider the question whether the respondent dredge is a vessel, within the meaning of the maritime law, as for the reason stated the libel and intervening libel must be dismissed, and an order will be entered accordingly.