**Henry L. HESS, Jr., Administrator of the Estate of George William Graham, Deceased, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15685.**

United States Court of Appeals Ninth Circuit.

Aug. 20, 1958.

Hess & Hess, Clayton Hess, Geoffrey C. Hazard, Jr., Cleveland C. Cory, Portland, Or., for appellant.

George C. Doub, Asst. Atty. Gen., Paul A. Sweeney, Samuel D. Slade, Leavenworth Colby, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., C. E. Luckey, U. S. Atty., Portland, Or., for appellee.

Before HEALY, POPE, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

The sinking of a tug and barge being utilized in repairing the spillway deck of Bonneville Dam gave rise to this action. Five of the six men on board the tug and barge lost their lives. The administrator of the estate of one of these men brought this action against the United States, to recover damages for wrongful death. Jurisdiction was asserted under the Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2674.[1]

---

1. 28 U.S.C.A. § 1346(b):
"Subject to the provisions of chapter 171 of this title, the district courts, together with the District Court for the Territory of Alaska, the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
28 U.S.C.A. § 2674:
"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
"If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons

The case was tried without a jury. Plaintiff asked the court to render judgment in his favor under the provisions of the Employers' Liability Law of Oregon (Liability Law).[2] In the alternative, he sought recovery under the Oregon Wrongful Death Act.[3] The Government's position was that, since the accident occurred on navigable waters within the territorial limits of Oregon, only the Wrongful Death Act could be applied, and that the United States was not liable thereunder.

The trial court held that the Liability Law did not apply, and that the plaintiff failed to prove a breach of duty which would make the United States liable under the Wrongful Death Act. Judgment was therefore entered for defendant. Plaintiff appeals, challenging the determinations made by the trial court with regard to each of these statutes.

The facts necessary to be considered on this appeal, as set out below, are drawn from undisputed findings of fact entered by the trial court.

Bonneville Dam, owned and operated by the United States, is located on the Columbia River, between the states of Oregon and Washington. The Columbia River constitutes navigable waters of the United States, and the point where the accident occurred, as set out below, lies within the jurisdiction of the state of Oregon.

Bonneville Dam consists of several facilities. including a powerhouse which lies between the Oregon shore and Bradford Island, and a spillway dam which lies between the island and the Washington shore. The spillway dam contains eighteen bays, which, for convenience herein, are numbered 1 through 18, starting with the fishway bay on the Washington shore as bay 1.

In each bay, there is a movable gate fifty feet wide and fifty feet high. These gates are opened and closed by being lifted or lowered in a vertical direction. When shut, they rest on the top of the "ogee" section, which is the upper line of the submerged stationary portion of the dam. On the bed of the river, extending downstream across the width of the dam, is a concrete structure called the baffle deck. This deck is dotted with concrete blocks called "baffles," which are built into the deck. Their function is to dissipate the energy of the water discharged through the dam, and to reduce its downstream velocity.

In the interval between the completion of the dam in 1938 and the summer of 1954, the baffles had become eroded by the flow of water. Desiring to restore them to their original condition, the United States entered into a contract with Larson Construction Company (Larson), an independent contractor. The contract contemplated the construction of a cofferdam closing off the south half of the spill-

respectively, for whose benefit the action was brought, in lieu thereof."

2. ORS 654.305:
   "Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employes or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

3. ORS 30.020:
   "When the death of a person is caused by the wrongful act or omission of an-

other, the personal representatives of the decedent, for the benefit of the surviving spouse and dependents and in case there is no surviving spouse or dependents, then for the benefit of the estate of the decedent, may maintain an action against the wrongdoer, if the decedent might have maintained an action, had he lived, against the wrongdoer for an injury done by the same act or omission. Such action shall be commenced within two years after the death, and damages therein shall not exceed $20,000, which may include a recovery for all reasonable expenses paid or incurred for funeral, burial, doctor, hospital or nursing services for the deceased."

way baffle deck. It was understood that construction of this cofferdam would be commenced while water was being discharged through the spillway dam.

By the terms of the contract, Larson was obliged to inform the United States of all steps proposed to be taken which would affect the operation of the dam. The contractor was to supply all equipment, including the tug and barge involved in this action, and all labor used in the performance of the contract. The United States had no control over the manner or method by which the work under the contract was to be accomplished. It was interested only in the general result in conformity with the contract specifications. The United States, however, retained a right to inspect the work of the contractor. The contract further contemplated that the operation of the dam, including the spillway dam gates, would be conducted by personnel of the United States.

On August 13, 1954, the United States notified Larson that the water level of the river was such that work under the contract should commence no later than August 23, 1954. On the same day (Aug. 13, 1954), following a conference between personnel of the United States and the contractor, it was found possible to close gates 11 through 17. This included all of the gates on the south half of the spillway dam from gate 11 southward toward Bradford Island, except for the fishway gate. These gates were closed on that date, and remained closed during all times material to this suit.

The Government inspector in connection with this work was Patrick S. Leonti. In addition to his inspection duties, Leonti was to act as liaison between the contractor and Government employees concerned with the operation of the dam. Leonti informed Larson that any requests for closing the gates in the spillway dam should be made through him.

According to the plans and specifications of the contract, a part of the cofferdam was to consist of a timber crib. This crib was to rest in bay 9, starting at the top of the ogee curve and running at right angles to the face of the dam. Larson concluded that the curved slope, as originally constructed, may have become eroded to some degree. He therefore determined that it was necessary to take soundings in bay 9, for the purpose of establishing the true cross section of the ogee at that time.

On August 18, 1954, the contractor's representative informed Leonti that the contractor proposed to take soundings in bay 9 on August 20, 1954. This would be done, Leonti was informed, by taking a tug and barge into bay 9, and taking soundings off the side of the barge. Leonti was requested to have the gates in bays 9 and 10 closed by 12:30 p. m. on August 20, to facilitate the planned operations.

Leonti forwarded this request to the operations division of the dam, and, at the designated time, gates 9 and 10 were closed. Gates 11 through 17 had already been closed, as previously indicated. Larson sought no advice from the Government personnel at the dam, and the latter gave Larson no advice as to the hazards of the proposed sounding operation.

The day before this operation was to take place, the contractor's superintendent performed a reconnaissance run in another tugboat in the same area. His purpose was to determine whether it would be a safe operation. Based on this reconnaissance run and on personal observation, Larson determined that the operation could be safely performed.

Shortly before 2:00 p. m., on August 20, 1954, Larsons' tug "Muleduzer," pushing his barge, set out from Bradford Island. The barge was made fast to the tug by four steel lines, and the two craft were, in effect, a unit. The equipment and personnel to be utilized in the operation were selected solely by Larson.

No employee of the United States participated in this operation, or gave the contractor or any of his employees any directions or orders with respect to it. Nor was there any intermingling of employees of the United States with those of the contractor in connection with the

work being performed at the time of the accident. Appellant's decedent was a member of the sounding party aboard the tug. He occupied a nonsupervisory capacity, and had no control with respect to the manner in which the sounding operation was to be conducted.

The tug and barge headed downstream from Bradford Island, came about in the middle of the river, and headed upstream for bay 9. At this time, the flow of the Columbia River was 191,100 cubic feet per second. Of this flow, 52,300 cubic feet per second was being discharged through the spillway dam. Gate 8 was then open thirty-two inches, and 5,700 cubic feet of water per second was flowing through it. Gate 6 was open to the same extent, and accommodated the same flow of water. Gate 7 was open fifty-five inches, and 9,100 cubic feet of water was flowing through it.

As the tug and barge approached bay 9, the turbulent condition of the water in the spillway basin was open, apparent, and obvious to all, including the contractor, the operator of the tugboat, and the other employees of the contractor. The difference in elevation of the water in the turbulent area opposite the open gates, as compared with the area opposite the closed gates, was also visible and obvious.

When the barge reached bay 9, it veered north. The port bow of the barge struck the pier between bays 9 and 8, stoving a hole in the bow of the barge. As water came through the hole, the barge moved over in front of bay 8 and the other open bays north of bay 8. The barge and tug were swamped and sunk, with the barge being broken to pieces. The men aboard the tug and barge were thrown into the water, and all were drowned except one deckhand.

The immediate cause of the accident and the deaths of the men was the turbulent condition of the water. This condition made it impossible to control the movements of the tug and barge, and caused the barge to strike the pier.

On these facts, the trial court held, as previously noted, that the Liability Law was not applicable. The court did so for two separate and distinct reasons: (1) the Liability Law could not be constitutionally applied in this case, and (2) if it could be applied, the United States was not liable thereunder because it was not responsible for the work being performed by the decedent.

With regard to the first of these reasons, the trial court was invoking the principle that precludes the application of state statutes which "works material prejudice to the characteristic features of the general maritime law. * * *" Southern Pacific Co. v. Jensen, 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086.

In order for this principle to control this case, the trial court must have made two determinations: First, it must have held that the circumstances of the case called for application of the general maritime law, with modification or supplementation by Oregon statutes which would not work material prejudice to the characteristic features of the general maritime law. Second, it must have held that the Liability Law did not constitute constitutionally permissible supplementation of the general maritime law. Appellant argues that the trial court erred with regard to each of these determinations.

Had this been a suit between private persons to recover damages for personal injuries rather than wrongful death, the general maritime law would unquestionably apply. This is true because admiralty jurisdiction depends upon whether the injury was inflicted upon navigable water, irrespective of where the wrongful acts or omissions occurred. The Plymouth, 3 Wall. 20, 70 U.S. 20, 36, 18 L.Ed. 125.[4] Here it is established that the accident occurred on navigable water.

4. An exception is made where the subject-matter of the litigation is a matter of mere local concern. Grant Smith-Porter Co. v. Rohde, 257 U.S. 469, 477, 42 S.Ct. 157, 66 L.Ed. 321. See, also, Hahn v. Ross Island Sand & Gravel Co., Or., 320 P.2d 668. But here it cannot be doubted that the activities in which de-

But, since the workman in this accident was killed, it would have been constitutionally permissible, in a suit between private persons, to apply the Oregon Wrongful Death Act, instead of the general maritime law, which provides no remedy for wrongful death. In Western Fuel Co. v. Garcia, 257 U.S. 233, 242, 42 S.Ct. 89, 66 L.Ed. 210, it was held that application of a state wrongful death act, under such circumstances, will not work material prejudice to the characteristic features of the general maritime law. See, also, Thompson v. Union Fisherman's Co-op Packing Co., 128 Or. 172, 273 P. 953.

Since the Oregon Wrongful Death Act would thus have been applied in a suit between private persons, this would seem to require a like holding in this suit, in which the United States is the defendant.[5]

Appellant, however, points to the closing words of 28 U.S.C.A. § 1346(b) a provision of the Tort Claims Act, as calling for a different result. The statutory language relied upon reads: " * * * Where the United States, if a private person, would be liable to the claimant in accordance with the law of the place *where the act or omission occurred.*" (Emphasis supplied.)

Appellant argues that the quoted language operates to change the general conflicts rule which would apply the law of the place where the accident occurred, and requires application of the law where the wrongful acts or omissions occurred. Since the asserted negligent acts or omissions of the United States took place on the spillway section of Bonneville Dam, which, he asserts, is an extension of Oregon land, it is contended that the general maritime law has no application. Therefore, the proper law to be applied, appellant urges, is the Liability Law, as that is the law which would be applied between private persons in an action based on negligence occurring on land in that state. Under this theory, the question of whether the Liability Law would work material prejudice to the characteristic features of the general maritime law would be immaterial.

Inherent in appellant's analysis, summarized, above is the proposition that the statutory words, "place where the act or omission occurred," mean the place where the act or omission first manifested itself. Support for this proposition is to be found in the majority opinion in Eastern Air Lines v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62, 80.

This court, however, has given these statutory words a different construction. In United States v. Marshall, 9 Cir., 230 F.2d 183, 187, it was held that these words mean the place where the negligence, either of act or omission, "became operative, directly causing the injury and not places where the negligence existed but was then inoperative."

Applying this rule here, it follows that any act or omission of Government personnel on Bonneville Dam became operative, directly causing injury, on the navigable waters of the Columbia River. It was there that the tug and barge went out of control and were swamped and sunk by reason of the force, turbulence, and volume of water coming through the spillway gates. Hence the tort law to be applied is that which Oregon would apply with regard to a tort committed on its navigable waters.

cedent was engaged had a direct relation to navigation and commerce. Bonneville Dam has been recognized by the supreme court of Oregon as an aid to navigation. Atkinson v. State Tax Commission, 156 Or. 461, 62 P.2d 13, 67 P.2d 161, affirmed 303 U.S. 20, 58 S.Ct. 419, 82 L.Ed. 621. See, also, section 1 of the act authorizing the Bonneville Project, approved August 20, 1937 (16 U.S.C.A. § 832), which begins: "For the purpose of improving navigation on the Columbia River, and for other purposes incidental thereto. * * * "

5. See the "if a private person" and "as a private individual under like circumstances" clauses of the Tort Claims Act, footnote 1.

But, even if it were to be assumed that the law which controls is that of the place where the act or omission first manifested itself, there are other considerations which call for rejection of appellant's ultimate conclusion.

■ The "place" referred to in the statute means the state in which the act or omission occurred, not a particular locality or kind of terrain within the state (such as Bonneville Dam), as appellant assumes. In our view, the context, and particularly the immediately preceding statutory words, "the law of the," require this conclusion.

■ Moreover, the "law" of the state to be applied is not limited to the law having direct reference to tort liability. It includes, also, the law of the state concerning conflict of laws (as in diversity cases) and the law to be applied in determining whether an admiralty or nonadmiralty case is presented. This conclusion is required because the statutory words, "law of the place," are broad enough to include the areas last mentioned, and those areas are not excepted in the statute.

This conclusion is also required because the more limited construction which appellant would place on this language runs counter to other provisions of the Tort Claims Act. The accident here in question actually occurred on navigable water. In a suit between private persons, Oregon would have applied the general maritime law as supplemented by state statutes which will not work material prejudice to the characteristic features of the general maritime law.

The United States is entitled to similar treatment, else it would not be liable "in the same manner and to the same extent as a private individual under like circumstances," as required by the Tort Claims Act. 28 U.S.C.A. §§ 1346(b), 2674. In order for the government to receive this similar treatment, it must be held that the Oregon law to be applied includes the law of conflicts and the law

to be applied in determining whether this is an admiralty or nonadmiralty case.

The view just expressed is not in harmony with the result reached in Eastern Air Lines v. Union Trust Company, supra [95 U.S.App.D.C. 221 F.2d 80]. The reason the majority in that case restricted "the law of the place" to be applied to tort liability law, and excluded these other areas of substantive law, is not indicated in the opinion. The precise question of whether admiralty or nonadmiralty law should be applied was not presented in the Eastern Air Lines case.

For the reason indicated, we are of the opinion that the Liability Law may not be applied in this case, unless it is a constitutionally permissible supplementation of the general maritime law. We now consider whether it is.

A provision of the Liability Law requires all owners, contractors, subcontractors, or other persons having charge of, or being responsible for, any work involving a risk or danger to the employees or the public to "use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine, or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices." ORS 654.305.

Under this statute, the circumstances under which one person may have some duty of care with regard to another person are enlarged over those prevailing under the general maritime law. More important, the standard of care which must be met in fulfilling such duty is greatly increased over what it would be under general maritime law.

Appellant has acknowledged that the standard of care required under the Liability Law is higher than under the general maritime law, where, as here, the doctrine of unseaworthiness has no application. The supreme court of Or-

egon has also so held.[6] That court has also expressly held that, where the rights of the parties are to be determined by the maritime law, the provisions of the Liability Law are not applicable. Hawkins v. Anderson & Crowe, 84 Or. 94, 164 P. 556, 558.[7]

Appellant points out that, with respect to defenses, the Liability Law is closer to the general maritime law than is the common law, which would be applied under the Oregon Wrongful Death Act.[8] What is lost sight of, however, is that, under the general maritime law, appellant could not even get into court, because an action for wrongful death will not lie.

The courts have come to the aid of the plaintiff in this circumstance to the extent of making available a state wrongful death statute. Under that statute, however, a defendant is chargeable with no greater standard of care than would be the case under the maritime law, and he gains the benefit of the more effective defenses of the common law. See 1 Benedict on Admiralty, 6th ed., 392, § 148. On balance, this is held to produce a result which does not work material prejudice to the characteristic features of the general maritime law.

What appellant is asking for, however, would upset this balance in two particulars. While gaining, as in the case of the Wrongful Death Act, an avenue of relief not available in admiralty, he would also (1) benefit from an increase in the standard of care which the Liability Law would place upon appellee, and (2) escape the more effective defenses which he would have to meet were the Wrongful Death Act being applied. In our view, the result would be an unconstitutional displacement of the essential features of general maritime law.

We therefore conclude that the trial court did not err in holding that the Liability Law could not be constitutionally applied in this case.[9]

■ The final question presented is whether the trial court erred in determining that appellant was not entitled to recover under the Oregon Wrongful Death Act because negligence had not been proved.

In questioning this determination, appellant does not attempt to charge the United States with negligence, if any, of the independent contractor. It argues, however, that the United States is here in the same position that an owner of premises would be with respect to employees of an independent contractor engaged in work on the premises. Contending that Government personnel must have been aware of the hazards of nav-

---

**6.** Hoffman v. Broadway Hazelwood, 139 Or. 519, 10 P.2d 349, 11 P.2d 814, 83 A.L.R. 1008; Fromme v. Lang & Co., 131 Or. 501, 281 P. 120.

**7.** See, also, Sanderson v. Sause Bros. Ocean Towing Co., D.C., 114 F.Supp. 849. Contra, Keithley v. North Pacific SS Co., D.C., 232 F. 255.

**8.** Appellant draws this comparison between the defenses which are available:

| Incident | Common Law | Maritime Law | Employers' Liability Law |
|---|---|---|---|
| Contributory negligence | Complete Defense | Mitigation of damages | Mitigation of damages |
| Assumption of risk | Complete Defense | Mitigation of damages | No defense |
| Negligence of fellow servant | Complete Defense | No defense | No defense |

**9.** It is unnecessary for us to consider whether the trial court was also correct in ruling that, if that act were applied, the United States would not be liable thereunder because it was not responsible for the work being performed by the decedent.

igating the tug and barge in bay 9, under the conditions then existing, appellant asserts, in effect, that they should have decreased the hazard (presumably by closing additional gates in the area), or should have warned the contractor of the extreme danger.

We assume, for present purposes, that the United States owed a duty to decedent equivalent to that owed by an owner of premises to the employee of an independent contractor working on the premises. We also agree with appellant that, under the evidence, Government personnel charged with operating the dam were aware of the amount and velocity of water which was going through the spillway gates at the time of the accident. A finding of fact, if the trial court had made it, that Government personnel must have realized that the proposed sounding operation involved a certain amount of danger, would also be supportable.

But we find no basis in the record for the inference appellant wants us to make, that Government personnel "were aware of the limited power of the tug Muleduzer, and its inability to cope with the turbulent water in the spillway basin. . . ." Nor does the evidence warrant a finding appellant would have us make, that Government personnel knew, or should have known, that the contractor and his employees "did not fully appreciate the great danger created by the spillway gates immediately adjacent to bay 9 being permitted to remain open."

The record indicates that the contractor had more information concerning the hazards to be met than did Government personnel. The amount and velocity of the flow through the spillway gates were known to him. The turbulence it created was open and apparent. In addition, the contractor knew the capabilities of his tug, and was familiar with the way it and the barge could be operated. He had also made a personal reconnaissance of the area on the previous day. With all of this information, he yet misjudged the danger. Government personnel, with less information, could not be expected to have a better appreciation of the danger.[10]

Dye v. United States, 6 Cir., 210 F.2d 123, cited by appellant, is inapposite. There, actions were brought to recover for the wrongful death of several persons who were drowned when their small boats were sucked by a strong current through an open wicket of a dam on the Ohio River. It was held that the United States was negligent in its failure to use protective measures for the benefit of navigators, and to give adequate warning of the dangerous condition at the dam to small boats navigating near it.

In the Dye case, the open wickets on the dam amounted to a latent hazard, not perceivable by members of the public boating upstream. In our case, however, the turbulent condition of the water was observable, and observed, by all. Here, in addition, the contractor had made an independent study of the hazards involved, and had satisfied himself that the work could be safely accomplished.

If it be assumed, however, that the negligence of Government personnel could be inferred from the evidence, it was not a necessary inference, and the trial court was not required to make it. As stated in United States v. Marshall, 9 Cir., 230 F.2d 183, 187, "negligence is ordinarily a question of fact to be resolved by the trier of fact. [Citing cases.] It is only where the facts are undisputed *and* where but one reasonable conclusion can be drawn therefrom the negligence becomes a question of law."

Whether the determination of the trial court that there was no breach of common-law duty owing to decedent is viewed as a finding of fact or a conclusion of law, we hold that, in making that determination, the trial court did not err.

Affirmed.

10. Had the contractor asked for the closure of more gates, this would presumably have been done. Had it not been done, the contractor could have declined to proceed. The sounding operation was not specifically required by the contract.