**GENERAL ENGINE & MACHINE WORKS, INC., a corporation, Libelant,**

v.

**Danny SLAY, and the F/V DANLYN, her tackle, apparel, equipment, furniture, etc., Respondents.**

**No. 2938.**

United States District Court
S. D. Alabama,
Southern Division.

Oct. 16, 1963.

Alexander F. Lankford III, of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for libelant.

John H. Tappan, of Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for respondents.

DANIEL HOLCOMBE THOMAS, District Judge.

This libel was brought by General Engine against Danny Slay and the F/V DANLYN, *in personam* and *in rem* in an effort to establish and enforce a maritime lien arising out of an oral contract having as its subject matter certain work, materials, supplies, and equipment furnished to the respondents by the libelant.

The oral contract was a so-called "gentlemen's agreement" and was replete with uncertainties and ambiguities. In general terms, the respondent Danny Slay sought assistance from General Engine with respect to the installation of a certain type marine engine in the DANLYN, as well as General Engine's assistance in "rigging the boat." A "rough" price was agreed upon, as was the trade-in value of an engine already in the possession of the respondent. The total price was to be paid upon completion of the work. The respondent Danny Slay paid a portion of the amount in advance. At the time the initial agreement between the parties was made, the DANLYN was under construction on the ways at Sunset Boat Works, located on Fish River, in Baldwin County, Alabama. As stated above, the agreement between the parties was equivocal. The price therefore was subject to change due to the exigencies of time-labor-material contracts. The final completion date was also subject to change for the same reason.

Nevertheless, the libelant undertook to embark on the fulfillment of its portion of the contract while the DANLYN was still on the ways. After the pre-launch work was accomplished, the DANLYN was launched and remained for a short while at Sunset's place of business. She was later towed by the respondent to another location on Fish River, and soon after September 1, 1961, she was towed, still incomplete, to the Industrial Canal in Mobile County.

The libelant was engaged in working on the various aspects pertaining to the installation and rigging of the DANLYN at intervals while the hull of the DANLYN was still on the ways, after the DANLYN was launched and afloat at Sunset Boat Works, and also while the DANLYN was moored in the Industrial Canal.

The libelant contends that the reasonable value of such labor, materials, supplies and equipment furnished to the respondent amounts to $5748.75.

The libelant further contends that after $1000 credit on the trade-in engine is

deducted from the above amount, as well as payments previously made by the respondent, there remains $2765.75 still due and owing libelant by respondent.

The value of the work performed is not disputed by the respondent. However, the respondent claims:

(1) That the libelant agreed to perform the aforesaid work for $850 in addition to the $1000 credit allowed on the respondent's marine engine.

(2) That irrespective of the amount and value of the libelant's work, labor, supplies, equipment and material, this court is without admiralty jurisdiction because the contract between the libelant and the respondent was a contract for original construction of a vessel, and would therefore not support a maritime lien.

Since a jurisdictional matter is raised, the court is obligated to consider the respondent's second position first.

■ The general rule with regard to maritime liens permits a lien to attach to any vessel for any service rendered to such vessel of a nature so as to facilitate its use as an instrument of navigation. 55 C.J.S. Maritime Liens §§ 12–23.

■ It is possible for a maritime lien to arise out of either a contract or a tort. 55 C.J.S. Maritime Liens § 12.

■ However, in order for a maritime lien to arise out of a contract, the contract itself must be of a clearly maritime nature. 2 C.J.S. Admiralty § 24.

■ A maritime contract is an agreement which concerns transportation by sea, relates to navigation or maritime employment, or involves navigation and commerce on navigable waters. 2 C.J.S. Admiralty § 24, note 23.

■ If a contract is not directly or substantially related to navigation, even though it is to be performed on water, or on board, or for the benefit of a vessel, such contract cannot be enforced in a court of admiralty. The W. T. Blunt, D.C.Mich., 291 F. 899 (1923).

■ It is well settled that a contract to build a ship is non-maritime and is not within the jurisdiction of admiralty tribunals. Thames Towboat Co. v. The "Francis McDonald", 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920). In that case, hull had been completed and launched. The original builder found itself unable to proceed further and after an agreement with the owner, the appellant towed the hull to another location. More work was accomplished on the hull while it was in possession of the appellant. The ship was manifestly incomplete when the appellant received it. The masts were not in, nor were the bolts, beams, and gaff. The forward house was not constructed and she was not in "condition to carry on any service." The appellant worked on the vessel for some six weeks.

The court was faced squarely with the same issue in The "Francis McDonald" that is presented to this court in the instant case; i. e., whether a contract to furnish materials, work, and labor for the completion of a vessel not sufficiently advanced to discharge the functions for which intended is within the admiralty and maritime jurisdiction of the federal courts.

The court held that there was no federal jurisdiction in the cause and stated, 254 U.S. p. 244, 41 S.Ct. p. 66, 65 L.Ed. 245:

"Notwithstanding possible and once not inappropriate criticism, the doctrine is now firmly established that contracts to construct entirely new ships are non-maritime because not nearly enough related to any rights and duties pertaining to commerce and navigation."

Further, 254 U.S. at p. 245, 41 S.Ct. at p. 66, 65 L.Ed. 245:

" * * * we think the same reasons which exclude such contracts from admiralty jurisdiction likewise apply to agreements made after the hull is in the water, for the work and material necessary to consummate a partial construction and *bring the vessel into condition to function as intended*." (Emphasis supplied)

It is apparent to the court that the decisions are harmonious and the law well settled with respect to the rule that all work accomplished before a vessel is actually launched is regarded as original construction. However, there has been some conflict on the question of whether work done and materials furnished after the vessel has been launched, but before final completion should be classed as construction. The general and more widely accepted view is as set out in The "Francis McDonald", supra.

The opposite view holds that a structure becomes a ship as soon as she is launched and rides upon her destined element. The Eliza Ladd, 8 Fed.Cas. 491, No. 4364.

In 1907, this problem was decided by the United States Supreme Court in The Winnebago, 205 U.S. 354, 27 S.Ct. 509, 51 L.Ed. 836. This case was decided some thirteen years before The "Francis McDonald", and contributed a great deal toword the provisions of a sounder, broader judicial framework upon which to rest future decisions.

The Supreme Court dealt with the aspect of admiralty and maritime jurisdiction as regards the establishment of maritime liens against a *newly* constructed vessel for the value of work, labor, materials, and supplies furnished her by the libelant subsequent to her launching, but prior to her first voyage.

The court concluded that there was no admiralty jurisdiction, and commented 205 U.S. at p. 363, 27 S.Ct. at p. 512, 51 L.Ed. 836:

"Thus, * * * admiralty jurisdiction does not extend to a contract for building a vessel, *or to work done or materials furnished in the construction* * * *." (Emphasis supplied)

One further subdivision of the rule with regard to the admiralty jurisdiction of cases of this sort is possible: where the hull is completed and launched, but where certain work remains yet to be done to her. Some courts have held that a contract made after the launching with respect to the completion of such work is a maritime contract, and admiralty courts will take jurisdiction of any dispute arising therefrom. The Manhattan, D.C.Wash., 46 F. 797 (1891): The Revenue Cutter, No. 2, 20 Fed.Cas. 568, No. 11714. The contract between the parties in the instant case was entered into prior to the launching of the DANLYN, and work performed thereunder by the libelant was in the nature of original construction, irrespective of the fact that some of the work involved necessarily took place after the launching of the hull.

The libelant cites in support of its contentions the well known cases of: Tucker v. Alexandroff, 183 U.S. 424, 22 S.Ct. 195, 46 L.Ed. 264 (1902); New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482; The Scorpio, 181 F.2d 356, 5 Cir. (1950); and Pleason v. Gulfport Shipbuilding Corporation, 221 F.2d 621, 5 Cir. (1955).

The case of Tucker v. Alexandroff, supra, is distinguishable from the instant case. That case involves the meaning of the word "ship" as it pertained to a treaty agreement with a foreign nation. The New Bedford Dry Dock case, supra, as well as The Scorpio, and the Pleason cases, supra, are all concerned with the conversion of already existing hulls or vessels, and none of them pertains to contracts of original construction.

The rule as set out by the Supreme Court in the "Francis McDonald" case, supra, applies here. The court therefore, is of the opinion that this proceeding does not trench upon the exclusive jurisdiction of the federal courts in admiralty cases. The cause must necessarily be dismissed, and is is unnecessary for the court to consider the respondents' first contention regarding the actual amount in controversy.