Marvin **DUDLEY** et al., Plaintiffs,

v.

**BAYOU FABRICATORS, INC.,** a corporation, Defendant.

**Civ. A. No. 5882-70.**

United States District Court,
S. D. Alabama, S. D.

Aug. 25, 1971.

G. Hamp Uzzelle, III, Mobile, Ala., for plaintiffs.

Ray G. Riley, Jr., Mobile, Ala., for defendant.

DANIEL HOLCOMBE THOMAS, Chief Judge.

The above-styled case was regularly set down for trial on June 15, 1971, and after hearing and considering the evidence and arguments of counsel, the

Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiffs have brought this suit to recover damages from the defendant for breach of its implied warranty in the sale of a vessel and for her negligent construction. The plaintiff, Marvin Dudley, purchased the M/V ARISTOCRAT from the defendant, Bayou Fabricators, Inc., in June, 1968 for $105,000.00. The ARISTOCRAT is an 87 foot, steel-hull, diesel-powered shrimp boat.

2. The ARISTOCRAT was damaged by fire on August 30, 1969, while she was shrimping off the coast of Louisiana. The fire occurred in the engine room and caused extensive damage, leaving her disabled without electrical or motive power.

3. The sequence of events which led up to the fire are as follows: The electric cables from the batteries to the engine were strung over the fuel lines under the engine room flooring. To avoid direct contact with the galvanized pipe fuel lines, the cables were strung through 1½″ x 8″ insulated, fairlead pipes. These fairlead pipes were welded to the fuel line. One of the fairlead pipes broke loose leaving, at the point of the break, a pin hole leak *and* an abrasive surface. The fairlead pipe dangling below the fuel line held the cable tight against the fuel line and its abrasive surface. Eventually the insulation was rubbed off, producing a short circuit, which in turn heated the diesel fuel in the line, which was then ignited by a spark from the short circuited cable.

4. The fire was extinguished by cutting off its oxygen supply, accomplished by closing air vents and doors to the engine room. As all motive and electrical power was lost, the vessel had to be towed to port. A Coast Guard vessel towed her to Grand Isle, Louisiana. She was subsequently towed to her home port, Sabine Pass, Texas, by her sister ship, the M/V MARDI GRAS.

5. Marine Surveyor, Robert K. Hansen,[1] testified that the ARISTOCRAT suffered the following damages:

1. Main engine extensively burned on port side, including all wiring, fuel system instruments, air intake starter, alternator and hoses.
2. Electrical system extensively burned.
3. Marine Plywood flooring charred.
4. Electric driven fresh water pressure system switch inoperative.
5. Four batteries damaged.
6. Six fuel system valves, two flexible hoses and fuel lines burned.
7. Engine room smoke stained.

6. Due to the loss of electrical power needed to drive the power winches, the following equipment was lost:

1. Two 70′ nylon nets
2. Two sets 12 x 40 doors
3. Two lazy lines, 27 fathoms x ¾″ nylon
4. Two tickler chains, ⅜″ x 70 fathoms
5. Two sets chafing gear
6. Two trawl cables, 900 fathoms x 9⁄16″
7. Two bridles, ½″ x 50 fathoms
8. Two sets shackles, thimbles, etc.

The replacement of the above cost $4,006.09. There was no evidence that the Captain's action[2] was not reasonable under the circumstances.

---

1. This was not a joint survey with the defendants, despite the suggestion of Hansen to that effect. However, since defendant rested without presenting any evidence, the Court is unable to determine whether the defendant was prejudiced thereby.

2. The ARISTOCRAT could not retrieve its nets and other equipment in the water and would have had to cut them loose before being towed. Therefore, the captain gave the nets to a nearby unidentified vessel who was able to retrieve them through the use of its own winches. There is no evidence presented that plaintiffs ever recovered anything from this salvor.

7. The repairs to the engine room area cost $8,373.79. The survey by Mr. Hansen cost $188.60. Plaintiff offered no evidence to refute the reasonableness and necessity of these repairs. The Court finds them to be reasonable and necessary.

8. The ARISTOCRAT was towed from Grand Isle, Louisiana, to Sabine Pass, Texas, by the MARDI GRAS. The MARDI GRAS was dispatched from Sabine Pass at 10:00 A.M., September 1, 1969, and returned with the disabled ARISTOCRAT at 10:00 P.M. on September 3rd, for which she claims a towage fee of $1,500.00 ($25.00 per hour for 60 hours). After the ARISTOCRAT was surveyed she was towed to Orange, Texas by tug for the repairs. Towage charges were $115.00 (7 hours at $16.50 an hour).

9. The ARISTOCRAT was out of service from August 30, 1969, until October 10, 1969. She would have been able to make three trips during that period if the accident had not occurred. The average value for the catches of the trip immediately prior to the fire and the trip immediately after the fire was $3,484.80.[3] The ship's share (65% of the catch) of three voyages at $3,484.80 per voyage, less $1,170.00 for fuel and ice expenditures, is $5,626.36. The Court, however, is of the opinion that this sum is too high in as much as this figure depends on many varying factors, such as weather conditions, etc. The Court finds that the sum of $2,813.18 will amply compensate plaintiffs for its lost profits.

10. The vessel was built in Bayou La Batre, Alabama, and completed in June of 1968 whereupon it was delivered to Marvin Dudley, in Bayou La Batre. At sometime thereafter, Dudley conveyed his interest to Sabine Offshore Services, Inc., and/or Channel Shrimp Company.[4] Although Dudley was not the owner of the vessel at the time of the accident, he was, and still is, the registered owner of the ARISTOCRAT. This registration was retained so that the corporations would not have to refinance the ship at a higher interest rate.

11. The ARISTOCRAT'S sister ship, the M/V MARDI GRAS was also built by the defendant at its Bayou La Batre yard and delivered to Dudley in October, 1968. The ships are virtually identical. The fairlead pipes aboard the MARDI GRAS were welded to brackets that were bolted to the fuel lines. This is considered a proper ship-building practice. The Court assumes that both vessels were built according to the same design; therefore, there was no negligent design of the ARISTOCRAT. However, the Court does find that the manner in which the fairlead pipes were attached to the fuel line on the M/V ARISTOCRAT constituted negligent construction.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction under 28 U.S.C.A. § 1332 and 28 U.S.C.A. § 1333. The first cause of action claims damages for a tort that occurred on navigable waters which does invoke admiralty jurisdiction. The second cause of action claims a breach of implied warranty which does not invoke admiralty jurisdiction[5] but there is diversity of citizenship and the requisite jurisdictional amount.

2. An action for breach of a contract for the construction and sale of a ship is clearly not within admiralty

---

3. There was testimony that this 40-day period is the peak shrimping season—producing 30% more in catches than in August or October.

4. These two corporations, of which Dudley is a major shareholder, were added as party plaintiffs by amendment during the course of the trial.

5. There is some authority that admiralty has jurisdiction over a breach of implied warranty sounding in tort. (See discussion in In Re Alamo Chemical Transportation Co., 320 F.Supp. 631 (S.D.Tex., 1970) but the plaintiff clearly shows in his post-trial brief that he was invoking the implied warranties under the Sales section of the Alabama U.C.C.

jurisdiction. Thames Towboat Co. v. The Francis McDonald, 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920); Kossick v. United Fruit Co., 365 U.S. 731, 737, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Jack Neilson, Inc. v. Tug Peggy, 428 F.2d 54 (5th Cir., 1970); General Engine & Machine Works, Inc. v. Slay, 222 F.Supp. 745 (S.D.Ala., 1963). This rule applies equally to implied warranties arising from such a contract. Therefore, under the Erie doctrine,[6] Alabama law must govern the rights of the parties.

■ 3. The warranties under which plaintiff seeks recovery are governed by Sections 2–313 through 2–317 of Title 7A, Code of Alabama, 1940 (1966 Supplement). The legislature in adopting the U.C.C. did not change the privity of contract requirement in cases involving economic loss.[7] The rule in Alabama clearly requires privity in enforcing warranties in a sale where only economic loss is suffered. Blitzstein v. Ford Motor Co., 288 F.2d 738 (5th Cir., 1961); Harnischfeger Corp. v. Harris, 280 Ala. 93, 190 So.2d 286 (1966); Cotton v. John Deere Plow Co., 246 Ala. 36, 19 So.2d 727 (1944).

■ 4. It is clear that a tort is deemed to have occurred not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action. Hess v. United States, 259 F.2d 285 (9th Cir., 1958), cert. denied 359 U.S. 923, 79 S.Ct. 604, 3 L.Ed.2d 627; Howmet Corp. v. Tokyo Shipping Co., 320 F.Supp. 975 (D.Del., 1971); O'Connor & Co. v. City of Pascagoula, Miss., 304 F.Supp. 681 (D.Miss., 1969); Bible v. Chevron Oil Co., 308 F.Supp. 312 (E.D.La.1969). Accordingly, maritime law governs the rights of these parties, since the tort occurred on the navigable waters of the United States.

5. There is ample authority—all of recent vintage—that a products liability action predicated on negligence will lie in admiralty. McKee v. Brunswick Corp., 354 F.2d 577 (7th Cir., 1965); Schaeffer v. Michigan-Ohio Navigation Co., 416 F.2d 217 (6th Cir., 1969); In Re Alamo Chemical Transportation Co., 320 F.Supp. 631 (S.D.Tex.1970); Ohio Barge Lines, Inc. v. Dravo Corp., 326 F.Supp. 863 (W.D.Penn., 1971). Whether the action be called products liability, breach of implied warranty sounding in tort or tort on navigable waters, if the action is based on a negligent act or omission by the manufacturer or builder that is the proximate cause of subsequent personal or property injury, liability attaches and is actionable under admiralty.[8]

■ 6. The fact that the injury occurred over fourteen months after delivery of the vessel is of evidentiary significance only. The plaintiff's burden of proving proximate causation without intervening cause increases sharply with the passage of significant periods of time. The burden was amply met in the case now before the Court.

Therefore, in accordance with the above, the Court is of the opinion that the plaintiffs are entitled to a judgment against the defendant in the sum of $16,996.66, plus interest at the rate of 6% from October 10, 1969, to the date of this order.

---

6. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

7. Section 2–318 does away with the requirements of privity in cases involving personal injury.

8. This Court does not decide whether an admiralty court will apply a strict liability standard to a products liability action since the court has found this defendant to be negligent.