Jacob BLITZSTEIN, Appellant,

v.

FORD MOTOR COMPANY, Appellee.

No. 18552.

United States Court of Appeals
Fifth Circuit.

March 10, 1961.

Rehearing Denied June 8, 1961.

Kenneth Perrine, Sam Tenenbaum, Birmingham, Ala., for appellant.

Ralph B. Tate, S. R. Starnes, Birmingham, Ala., for appellee.

Before RIVES and WISDOM, Circuit Judges, and WRIGHT, District Judge.

RIVES, Circuit Judge.

On February 28, 1959, appellant Jacob Blitzstein purchased an "Anglia" or "English Ford" automobile from Vulcan Lincoln-Mercury, Inc., of Birmingham, Alabama. On the morning of March 2, 1959, Mr. Blitzstein had the car filled with gasoline, went for a short ride, returned to his home and parked the car in the street adjoining his house. About two hours later he again entered the automobile. As he turned on the ignition, there was an explosion followed by a flash fire, as a result of which appellant alleged he received severe injuries about his face, leg and hands.

Appellant attributed the explosion to the following circumstances. In the English Ford which he purchased the gasoline tank was located inside the trunk. The gasoline tank had a small crack in its upper part, not visible to the naked eye, which appellant claimed was a defect in its manufacture. Because of this defect, when the tank was filled gasoline leaked into the trunk. The trunk had no floor openings which would permit this gasoline to drain off. Thus, the leaked gasoline accumulated in the trunk. When the rays of the sun heated the trunk compartment, the trapped gasoline vaporized, collecting first in the trunk and then saturating the closed car. When Mr. Blitzstein switched on the ignition, the spark generated by the contact ignited the gasoline vapors, resulting in the explosion and fire.

Appellant filed suit in an Alabama State Court against the Ford Motor Co., Ltd., an English corporation,[1] the manufacturer of the automobile, and the Ford Motor Company,[2] a Delaware corporation with its principal place of business in Dearborn, Michigan, which serves as the exclusive American distributor for the products of the English Company. The case was removed to the Federal District Court on the ground of diversity of citizenship.

1. Hereinafter referred to as English Ford or as English Company.

2. Hereinafter referred to as American Ford or as American Company.

Appellant's complaint, as amended, alleged four separate theories as a basis for recovery against the defendants. Count one averred in general terms that the "automobile was defectively constructed or assembled and was not reasonably safe for the use and purpose for which it was sold or delivered, or when used in the usual and customary manner, but on the contrary, said automobile was defective and imminently and inherently dangerous and when gasoline was placed in the same * * * said automobile was likely to explode * * *," that the danger was or should have been known to the defendants had they exercised due diligence and that said condition was "not known to the plaintiff and was not revealed to the plaintiff by the defendant." Count two averred that the gasoline tank was "defective and defectively constructed or assembled." The third count [3] alleged "that the defendants * * *improvement warranted to the public * * * that the article * * * was fit and safe for the purpose for which it was manufactured and to be used by the consumer as a vehicle of transportation * * *" (emphasis added); that appellant relied on said warranty, and that said warranty was breached. The last count [4] sounded in *express warranty* wherein plaintiff averred "that the defendants * * * did warrant in writing all of such parts of said automobile to be free from defects in workmanship or material and did authorize and direct the dealer to warrant to the purchaser each part of each Ford Motor Company English Ford Line, to be free from defects * * *"; that such warranty was delivered to and relied on by appellant; and that said warranty was breached by defendants.

Upon receipt of notice of the litigation, English Ford moved to dismiss on the ground, inter alia, of lack of jurisdiction over the person. The motion was granted by the district court.

■ At the outset appellee contests appellant's right to raise here the issue of dismissal of the English Company. The notice of appeal in this cause, wherein appellant is required by Rule 73(b), Federal Rules of Civil Procedure, 28 U.S. C.A., to specify "the judgment or part thereof appealed from," states that appeal is taken "from the final judgment rendered on the 29th day of March, 1960, and the motion for a new trial overruled and denied on the 10th day of May, 1960." The English Company was dismissed by order of March 18, 1960. Although Rule 73(b) is mandatory, and compliance therewith is a prerequisite to our jurisdiction,[5] the rule was "intended to take the place of more complicated procedures to obtain review, and the notice should not be used as a technical trap for the unwary draftsman." [6] In overruling appellee's objection, we reaffirm our view that in determining whether Rule 73(b) has been complied with, we may look to "the statement of points and designation of contents of record on appeal." [7] Both of those portions of the record before us clearly indicate that appellant intended to here raise the issue of the sufficiency of process over English Ford.

Since English Ford had not qualified to do business in Alabama, service was attempted to be made on it pursuant to Section 193 of Title 7 of the Code of Alabama.[8] That Statute provides for

---

3. "Claim C" of the amended complaint.

4. "Claim D" of the amended complaint.

5. Stone v. Wyoming Supreme Court, 10 Cir., 1956, 236 F.2d 275, 276.

6. Donovan v. Esso Shipping Co., 3 Cir., 1958, 259 F.2d 65, 68.

7. Carter v. Powell, 5 Cir., 1939, 104 F.2d 428, 430. See Di Giovanni v. Di Giovannantonio, 1956, 98 U.S.App.D.C. 147, 233 F.2d 26, 28.

8. "Wherever a foreign corporation has carried on or transacted business in this state without qualifying to do business herein as is provided by the constitution and statutes of this state * * * such corporation shall be deemed to have consented to the secretary of state being its true and lawful attorney, upon whom all such process, pleadings or papers may be served, until the statutes of limitations shall have run against the bringing of the action against said corporation, and

service "wherever a foreign corporation has carried on or transacted business in this state without qualifying to do business herein * * *." English Ford claimed in its motion to dismiss that at no time relevant to this lawsuit had it done any business in the United States, let alone in Alabama.

English Ford automobiles are manufactured in Dagenham, England, by the Ford Motor Company, Ltd. Those destined for America are "sold" to the American Company at Dagenham, pursuant to monthly purchase orders from the American Company. Although the English Company selects the ships on which the cars are to be transported, the American Company pays the freight and costs of marine insurance. Upon arrival in America, the cars are unloaded at independently-owned warehouses, where they are held until orders are received from local auto dealers. The local dealer has no contact with English Ford. He deals solely with American Ford.

English Ford does not solicit orders in Alabama. It has no employees in Alabama. It maintains no office, warehouse or other business establishment in Alabama. It has no property in Alabama, no bank accounts in Alabama, et cetera. The domestic distribution of English Ford products, training of mechanics to work on English Fords, and stocking of parts for those cars is completely handled by the Imported Car Division of American Ford. 54.6% of the stock of English Ford is owned by American Ford.

 Appellant urges upon us recent cases giving broad scope to the concept of "doing business." Most of these authorities are not relevant, however, for we are not here concerned with whether Alabama could constitutionally claim jurisdiction over English Ford. Rather, we face the more narrow question of whether English Ford has "carried on or transacted business" in Alabama within the meaning of Section 193 of Title 7.[9] We agree with the court below that it has not.[10]

Appellant's principal contention on this point is that by virtue of the 54.6% stock ownership English Ford is in reality the alter ego of American Ford, and that English Ford does business in Alabama in the guise of American Ford. We cannot deny that this argument has some appeal, especially when we consider the consequences to plaintiff of a dismissal of the English Company. Yet, we cannot say that Alabama decisions under which we are bound would extend that State's jurisdiction to the English Company. And there is persuasive authority to the contrary.[11]

Much of appellant's case left with the departure of the English Company. Though mortally wounded by this blow, appellant fought on bravely until the

the same shall be held as due and sufficient service upon such corporation. The secretary of state must immediately transmit by registered mail, return receipt requested, to such foreign corporation at its home office, a copy of such process, pleadings or papers served upon him. * * *" Section 193, Title 7, 1940 Code of Alabama.

The Secretary of State of Alabama mailed a copy of the summons and complaint to the Ford Motor Co., Ltd., Hapeville, Georgia. It appears that American Ford maintains a plant and office at this address, where mechanics are trained to service the English Fords, and a supply of parts for English Fords is maintained. Appellee argues that the notice sent to this plant is not sufficient compliance with the statutory requirement that notice be sent to the "home

office" of a nonqualified corporation. We need not, and therefore do not, pass on this contention.

9. See Pulson v. American Rolling Mill Co., 1 Cir., 1948, 170 F.2d 193, quoted with approval in Lone Star Package Car Co. v. Baltimore & O. R. Co., 5 Cir., 1954, 212 F.2d 147.

10. See Gayle v. Magazine Management Company, D.C.M.D.Ala.1957, 153 F.Supp. 861; Ex parte Emerson, 1960, 270 Ala. 697, 121 So.2d 914, 919–920.

11. See Cannon Manufacturing Co. v. Cudahy Packing Co., 1925, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Fergus Motors v. Standard-Triumph Motor Co., D.C. S.D.N.Y.1955, 130 F.Supp. 780; 2 Moore, Federal Practice § 4.25, at pp. 982–983 (1960).

trial court administered the coup' de grâce—a directed verdict in favor of American Ford.

■ Appellant's action on implied warranty failed because there was no privity between appellant and American Ford. Appellant bought his car from Vulcan Lincoln-Mercury and not directly from American Ford. Alabama law is clear that there can be no action on implied warranty in the absence of privity of contract.[12]

■ On his express warranty theory, appellant met with the same measure of success—none. The record reveals that the only express warranty which appellant ever received was the written dealer's warranty given by Vulcan Lincoln-Mercury. Appellant attempts to claim the benefit of a warranty from American Ford to Vulcan in which American Ford agreed to reimburse the dealer for costs of defective parts replaced on the English Ford car within the first four thousand miles of use. Appellant's theory is that this warranty "runs with the car" so as to give him an action against American Ford. But the Alabama law is dead against him.[13]

Reaching the negligence counts, the district court ruled that the "Manufacturers Liability Doctrine" was inapplicable for the obvious reason that American Ford was not the manufacturer. Appellant attempted to clear this hurdle by invoking the rule of Swift & Company v. Blackwell, 4 Cir., 1936, 84 F.2d 130, which holds that "one who labels a product with his own name or otherwise represents it to be his own, is to be treated on the same basis as if he had manufactured it * * *." Appellant's argument on this point is that American Ford held out the English Ford as its product. The facts do not sustain this contention. If anything, American Ford sought to distinguish the English Ford as a "foreign car." In the advertisements submitted in evidence, the emphasis is on the name "Anglia." The circulars and brochures which are distributed by the local auto dealers inform the public that the English Ford is a product of the English Company. The dealer who sold appellant his car maintained a showroom for his English Ford line separate from his Lincoln and Mercury showroom. Each English Ford in the showroom bore a large sticker identifying the car as a product of The Ford Motor Co., Ltd., of Dagenham, England. The trademark of the English Company was quite distinguishable from that of the American Company. Nowhere in the showroom or on the car itself is it referred to as a "Ford"—but only as an "English Ford." Finally, appellant himself testified that he was shopping for a "foreign car" when he decided on the English Ford. But even if the facts were otherwise, and assuming we could say that appellant bought the car thinking that it was a product of American Ford, and that that apprehension was a reasonable one, appellant must show some indication that Alabama has adopted or would adopt the rule of Swift & Company v. Blackwell, supra. This he has failed to do. Moreover, appellant does not refer us to any case in which the Swift rule was applied to nonfood products. Even if Alabama were to adopt the Swift rule, we could not in candor say that State would extend the rule to cover this situation.

■■ Analyzing the negligence claim still further, the district court noted, correctly we think:[14]

"However, in turning to the facts in this case, I think that we deal with the general proposition that one who supplied directly or through a third party a chattel for another

12. See Birmingham Chero-Cola Bottling Co. v. Clark, 1921, 205 Ala. 678, 89 So. 64, 17 A.L.R. 667; Cotton v. John Deere Plow Co., 1944, 246 Ala. 36, 18 So.2d 727, 729.

13. See cases cited in footnote 12, supra.

14. A variation of the so-called "Manufacturers Liability Doctrine" applies to nonmanufacturing vendors. See Crane Co. v. Davies, 1942, 30 Ala.App. 471, 8 So. 2d 189, 194, reversed on other grounds, 1942, 242 Ala. 570, 8 So.2d 196. See Restatement Torts, § 388.

to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier knows, or from facts known to him should realize that the chattel is or likely to be dangerous for the use for which it is supplied and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and fails to exercise reasonable care to inform them of its dangerous condition, or of the facts which make it likely to be so."

The district court assumed that the defect in the gas tank was in the car when it arrived in America—a question hotly disputed at trial.[15] Also assumed were the facts that the gasoline leaked into the trunk of the car, and that the explosion and fire were caused by the contact made by the starter button switch. Even so, the district judge believed a verdict had to be directed in American Ford's favor, since on the facts established in this case (1) there was no duty on American Ford to inspect the car when it arrived in America,[16] and (2) appellant had not proved that a reasonable inspection would have revealed the defect in the gas tank. We agree that a reasonable inspection would not have revealed the small crack in the upper part of the gas tank.

■ We now reach the point where we think the district court erred in granting a directed verdict in favor of American Ford. The district court correctly stated the rule, quoted above, that a supplier may be liable in failing to warn a purchaser of the dangerous condition of a chattel. In this case there can be no question that the American Com-

pany knew that the gas tank of the Anglia was located in the trunk of the car. Moreover, the testimony which we briefly quote below, showed that there was no drain in the trunk floor from which gas leaking or overflowing into the trunk could escape, nor was the trunk in any way ventilated so as to allow the escape of any gasoline vapors which might accumulate. A. Rosenfeldt, Fire Marshal, City of Birmingham, testified as follows:

"Q. The tank was clamped to the floor board? A. I don't know how it was anchored. It was in the trunk.

"Q. Did you check to see if there were any holes in the floor parts where liquids could run through? A. There was none.

"Q. There was no hole in the floor? A. That is correct.

\*　\*　\*　\*　\*　\*

"Q. Now was there any fire wall between the gas tank and the other part of the trunk? A. No, sir.

"Q. It was just a tank sitting there in the trunk just like it is sitting there now? A. Yes, sir.

"Q. And I believe you stated that there were no holes or vents in the bottom of the floor to allow gasoline or fumes to go out? A. No, sir.

"Q. And that trunk lid was sealed around where water would not get into it, wasn't it? A. I don't have a specific memory, but I know from general knowledge it is usually that way.

"Q. And the sides of the car were made out of what? A. It was pressed metal similar to other cars.

"Q. And with the trunk down that compartment would be pretty close and water right (sic), would it not? A. Yes, sir.

15. The cars were shipped to America completely assembled except for headlights, windshield wiper blades, floor mats and wheel covers. These latter parts were hooked up by employees of the warehouses where the cars were stored upon arrival in the United States. The gas tank was permanently installed in England.

16. See Restatement Torts, § 402, comment b, and illustrations 1, 2 (1948 Supp.)

"Q. I mean by that just the normal seepage? A. That would not make a whole lot of difference because gasoline vapors are heavier than air and when gasoline vapors get in the trunk the vapors would lie closely to the floor.

\* \* \* \* \* \*

"A. Yes we go to many places where we have to wash gas off the street where somebody parked a car with a full tank of gas and the sun heats it up and it runs out."

T. M. Francis, Engineer, testified:

"Q. In your examination of the trunk of that car, did you find any holes in the bottom of it that would have allowed the gasoline, or any other liquid, to run out of it if it got down into the car? A. I didn't find any hole in it except where the tube goes down at the bottom under the tank and connects to the gasoline line going up to the motor.

\* \* \* \* \* \*

"Q. You saw nothing wrong with the design or specifications of the gas tank itself? A. Not the tank, but I wouldn't put the gas tank in a trunk if I designed a car.

"Q. You have never designed automobiles, I take it? A. I never have.

"Q. But so far as the gasoline tank is concerned— A. I did not see a thing wrong with the design of the tank."

We think that a jury could reasonably have found that the American Ford Company was negligent in marketing a product which was inherently dangerous, of which danger it should have been aware from its long experience in the design and manufacture of automobiles, and that American Ford failed to exercise reasonable care to inform the buying public of this dangerous condition. Because of this view, we think the court below erred when it granted a directed verdict in favor of American Ford.

Affirmed in part and in part reversed and remanded.