Eunice Edna NECAISE, Substituted as Administratrix of the Estate of Willard L. Necaise, deceased, Appellant,

v.

The CHRYSLER CORPORATION, Appellee.

No. 20654.

United States Court of Appeals Fifth Circuit.

July 28, 1964.

---

Oscar B. Ladner, Gulfport, Miss., Albert Sidney Johnston, Jr., Biloxi, Miss., for appellant.

P. D. Greaves, Gulfport, Miss., Ronald R. Pawlak, Detroit, Mich., Walter E. Workman, Houston, Tex. (Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel), for appellee.

Before BROWN, MOORE * and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

In this products liability case we must review the action of the trial court in sustaining a motion by the defendant, The Chrysler Corporation (appellee), for a directed verdict. The plaintiff, Necaise (appellant),[1] received disabling injuries when a Chrysler-built Dodge pick-up truck which he was driving overturned

---

* Of the Second Circuit, sitting by designation.

1. Necaise died after trial and Eunice Edna Necaise, Administratrix of the Estate of Willard L. Necaise, deceased, was substituted as plaintiff-appellant.

on a "test drive." Motion for directed verdict was made when the plaintiff rested, but the court reserved its ruling until all the evidence was presented. This is a diversity case which arose in the state of Mississippi.

The plaintiff bases his case on breach of warranty and negligence. In defense Chrysler relies on the following "points": (1) there was insufficient proof that the truck was negligently manufactured "so that such negligence proximately caused or contributed to the alleged injury and damage"; (2) there was lack of privity of contract between the plaintiff and the defendant; and (3) the alleged defect was readily visible to the plaintiff "whose job was the testing and checking of the vehicle in question." In granting the defendant's motion for a directed verdict, the trial court stated:

"It*s* [sic] obvious to me that these 'U' bolts according to the record before me were not tightened and had never been tightened by anybody. They were loose and too loose but I don't believe there is any substantial evidence sufficient to justi*dy* [sic] a jury to conjecture and try and see whether or not they can find any liability in the case. I just don't think that there is any substantial evidence of any cause or connection [sic] between that piece of negligence on somebody's part if it is shown in this record that such negligence were that of the defendant in the case. For the record I will go on record as saying that I don't, however, regard the looseness of those bolts as being a patent defect

in the assembly of this vehicle. I think it was a latent defect and one that the average member of the general public wouldn't be expected or called on to detect, but that in my opinion doesn't have any controlling effect or bearing here. The law of Mississippi is and for sometime has been to the effect that there must be privity of relationship between an injured party and a manufacturer whom he sues for a defect in a piece of equipment."

The truck in question was delivered to the Navy Department at Gulfport, Mississippi. At the time of the accident the plaintiff was test-driving the truck pursuant to his duties as an employee of the Navy Department. When he was instructed to test drive the vehicle, the speedometer registered three miles. At the time of the accident it had been driven approximately ten or fifteen miles.[2] According to Necaise he was driving the truck alone on the test strip and when he applied the brakes the steering wheel pulled to the left, the truck started skidding, and the vehicle turned over three or four times causing the injuries alleged. At the trial he proved that the "U" bolts which connect the front axle and the springs and secure them to the frame and body of the truck had not been tightened and secured on the left side.[3] He testified that it was his opinion that the loose "U" bolts allowed the left side of the front axle to slip backwards when he applied the brakes and that such condition caused the steering apparatus to pull to the left and the truck to skid and turn over.[4]

2. The distance driven was estimated at various figures, all below forty miles.

3. The defendant lays considerable stress on the fact that it never was proved that the "U" bolts were loose, and claims the evidence only shows that three of the nuts which fasten them were not screwed to a tight position, and that one nut was missing. There is evidence to that effect, but there is also evidence that the "U" bolts were loose. Counsel for both parties, the court, and the witnesses constantly referred to loose "U" bolts as well

as to loose nuts on the "U" bolts, during the course of the trial.

4. Although Chrysler contends that Necaise was not an expert and that his opinion should therefore carry no weight, the following is found in Chrysler's brief:

"appellant was not an ordinary layman, but instead was a mechanic whose very duties of employment consisted of inspection, testing and checking of vehicles, including the truck in question here."

As usual the evidence was in sharp conflict. Chrysler employees and witnesses testified that "looseness of the 'U' bolts" would not have caused the accident. One witness testified that he had test-driven a similar vehicle with loosened "U" bolts under adverse conditions over rough terrain with no ill effects.[5]

5. The following excerpts from the testimony will demonstrate the conflicting views and opinions of the witnesses. Without objection (initially) the plaintiff testified as follows:

"Q And what did you find as to be the cause of the accident when you inspected the vehicle?

"A Well, I found where the 'U' bolts clamped the axle and the spring together there were two nuts only started and the other two were not on there and the threads of those 'U' bolts were undercoated."

Later there was objection which was overruled by the court and Necaise stated:

"Q In your opinion this was the cause of the accident?

"A That was the cause of the accident."

And later without objection the plaintiff testified:

"Q Did anything come loose on the truck, you said the front wheel locked?

"A Well, we found that 'U' bolt aloose after it had turned over.

"Q Loose or off?

"A No, the 'U' bolt was there, just the nuts, two nuts was started and two was missing.

"Q Did the clamps come aloose from whatever they were fastened on to and whatever they were holding?

"A No sir, they just slipped back see. See you have got a plate comes under that under your axles and the plate was down and it just slipped back I would say about four or five inches throwed that wheel back.

"Q Let your spring slide to one side?

"A Let the axle slide.

"Q The spring didn't move did it?

"A No sir.

"Q The axle was connected on to the spring or the spring to the axle?

"A Your axle hooks on to your spring which the axle slid back and your spring is stationary to your body.

"Q The axle came back toward the back end of the car?

"A That's right, throwed the wheel back see.

"Q Did the wheel lock?

Chrysler manufactured the truck, sold it to Chrysler Sales Corporation and gave a warranty as to fitness which was extended to the government through the Navy Department. There was evidence that the Chrysler Corporation made a number of warranty reimbursements on other vehicles involved in the same order

"A Well, after it after it uh jumped back six inches it wouldn't uh it just started sliding, see this other wheel just started skidding, skidding sideways.

"Q That's your left front wheel?

"A Left front wheel, yes sir.

"BY MR. OSCAR LADNER:

"Q Mr. Necaise, was this the first time that you had applied the brakes on this vehicle?

"A That's the first time I applied the brakes on it, only been driving ten miles an hour around this test track, you don't have to apply no brakes at all to go around this see.

"Q And it went out of control after you applied your brakes?

"A That's right. That's the onlyest time, that's when it done it when I throwed on the brakes the first time."

It was not claimed that the truck was being driven only ten miles per hour at the time of the accident, but substantially higher speed was estimated when the accident occurred. See note 7 infra.

Another witness for the plaintiff testified:

"Q Now when you arrived at the scene of this accident and found this truck turned up there what was the position of it?

"A Laying on the left side and I always look at stuff before we handle it so I walked around in front of it and I looked at the bottom where you could see the bottom and I saw nobody didn't have to show them to me I saw the two 'U' bolts was supposed to be holding the spring in place there and they was one nut missing and three just stuck on there had a little undercoating on them and they had moved back a little bit on the spring.

\*     \*     \*     \*     \*

"A I could see that the that the uh 'U' bolts on the spring was moved back when I looked at them.

"Q You saw that?

"A Yes sir, I saw that.

\*     \*     \*     \*     \*

"Q Did you make any examination of the spring or its relative location of the spring to the axle?

"A Well, all I could see the bolts on there wasn't tightened and looked to me

by which the truck in question was sold and delivered. A claim was made by the Navy on this vehicle but it was not known whether any monetary adjustment or reimbursement was made on the claim. Finally, in its Post-Submission Brief the defendant concedes that it might be reasonable to infer that the "U" bolts were loose because the nuts were found to be loose or missing.[6]

The defendant further concedes that the plaintiff's evidence established that the nuts on the "U" bolts were loose and that one nut was missing; that there was circumstantial evidence from which a jury might reasonably infer that this defect was attributable to negligence [on the part of defendant] in the manufacturing process. But, says the defendant, even if such conditions were a possible or probable cause of the plaintiff's inability to control the vehicle, such fact "is capable of proof by direct and positive evidence from one familiar with the mechanics of such vehicles," and that the plaintiff wholly failed to make such direct and positive proof. The defendant therefore concludes that the law presumes, in the absence of such direct and positive proof, that the evidence if presented would in fact destroy the plaintiff's case.[7]

---

like it was moved back a little bit to throw it out of line.

"Q How far would you say it was moved back, that is the axle?

"A About an inch.

"Q About an inch. You know what effect that would have on the operation of that vehicle?

"A Yes sir.

"Q You do know?

"A Yes sir. I hate to be driving it down the road sixty miles an hour and have to put on my brake.

"Q You think this machine was operated sixty miles an hour?

"A Well, you can go through there at that speed in that cycling road.

"Q I understand that but you don't know what his speed was do you?

"A No sir.

"Q Would you have to be going sixty miles an hour for it to malfunction?

"A No sir, I don't believe it would."

One of defendant's witnesses, presented as an expert, testified that the 'U' bolts were not loose, that there had been no movement of the spring or axle assembly, and that the loose nuts on the 'U' bolts would have no adverse effect on the operation of the vehicle, but he did testify as follows:

"Q Now you have stated that you uh had certain qualifications and expert training in this field. I ask you if uh that is a hazardous condition for a vehicle to be operated it?

"BY MR. GREAVES:

"If Your Honor please, we object to that. We think that's a jury question.

"BY THE COURT:

"Overrule the objection.

"A I would not say its hazardous. Its not a proper position.

"BY MR. OSCAR LADNER:

"Q Would you let a vehicle go out of your shop in that condition?

"A Would I?

"Q Yes.

"A Uh if I was managing of a business no."

The witnesses for the defendant stoutly maintained that the "U" bolts remained in place, that only the nuts were not in proper position, that the spring or axle had not changed relative positions, and that even if relative positions were changed the most adverse result would be to cause the vehicle to "lead to the left" to a minor degree.

As to "U" bolts the following is from Exhibit D–5 entitled "Dodge Truck *Shop Manual*": (emphasis added.)

"9. MAINTENANCE

"Always keep the U-bolts tightened securely. Spring breakage, at or near the center of the spring, may occur if U-bolts are loose. When the U-bolts are loose, the entire stress is on the center of the spring leaves. The nuts on the U-bolts should be tightened periodically during the early life of the truck."

6. The following is from the defendant's brief:

"While it might be reasonable to *infer* that the U bolts as such were loose because the nuts were found to be loose or missing (notwithstanding Martin's direct testimony to the contrary), the appellant's contention that the evidence shows that the U bolts were loose, is simply in error." (Martin was a defense witness.)

7. The following is from the defendant's brief:

"Appellants' case establishes that the nuts on the U bolts on this vehicle were

■ Directed verdicts should be granted sparingly. The right to a trial by jury is a basic constitutional right reserved by the Seventh Amendment and that amendment applies to diversity cases. Revlon, Inc. v. Buchanan, (5th Cir. 1959) 271 F.2d 795, 800, 81 A.L.R.2d 222. We recently had occasion to state the rule as to directed verdicts in Wells v. Warren Company (5th Cir. 1964), 328 F.2d 666:

"The law with respect to directed verdicts is well-settled. The Court should not grant a motion for a directed verdict if there is substantial credible evidence which would support a verdict in favor of the party against whom the motion is made. It is the function of the jury, not the court, to weigh and evaluate the evidence on both sides of a contested question. If there is a conflict in the evidence, the jury must resolve such conflict. If legitimate, contrary inferences may be drawn from the evidence, the choice of the proper deduction is also for the jury. A mere scintilla of evidence is not sufficient. There must be a conflict in substantial evidence. Substantial evidence is evidence of such quality, character and weight as would justify a reasonable person in drawing the inference of fact that is sought to be sustained. If the state of the evidence is such that it presents no conflict, nevertheless, if reasonable minds may draw conflicting or contrary inferences from the same evidence requiring different verdicts, it is for the jury to determine which is the correct inference. For the purpose of this opinion, we must accept as true the credible evidence adduced by the plaintiff Wells. Murray v. Pasotex Pipeline Co., 5 Cir. 1947, 161 F.2d 5; Baltimore & O. R. Co. v. Postom, 1949, 85 U.S.App.D.C. 207, 177 F.2d 53; Atlantic Greyhound Corp. v. Crowder, 5 Cir. 1949, 177 F.2d 633; Audirsch, et al. v. Tex. & Pac. Ry. Co., 5 Cir. 1952, 195 F.2d 629; Swift & Co. v. Morgan & Sturdivant, 5 Cir. 1954, 214 F.2d 115, 49 A.L.R. 2d 924; Texas Co. v. Savoie, 5 Cir. 1957, 240 F.2d 674. Such rules are not in conflict with the law of Florida. Southern Express Co. v. Williamson, 1913, 66 Fla. 286, 63 So. 433, L.R.A.1916C, 1208."

See also Lindeman v. Textron, Incorporated, (2nd Cir. 1956) 229 F.2d 273; Atlantic Coast Line Railroad Company v. Futch, (5th Cir. 1958) 263 F.2d 701; Clarkson v. Hertz Corporation, (5th Cir. 1959) 266 F.2d 948; Ford Motor Company v. Zahn, (8th Cir. 1959) 265 F.2d 729, and Blitzstein v. Ford Motor Company, (5th Cir. 1961) 288 F.2d 738. The law of Mississippi is substantially the same. Ballenger v. Vicksburg Hardwood Co. (1960), 238 Miss. 654, 119 So.2d 778.[8]

loose and that one nut was missing. There is circumstantial evidence from which a jury might reasonably infer that this defect was attributable to negligence in the manufacturing process. But if these loose or missing nuts were a possible or probable cause of the plaintiff's inability to control the vehicle, as appellant contends, that fact obviously is capable of proof by direct and positive evidence from one familiar with the mechanics of such vehicles. Plaintiff wholly failed to make or tender such proof and the presumption of law is that such evidence would in fact destroy his case. Here, this presumption is strengthened so as to be conclusive, because it is supported by unimpeached and uncontradicted competent evidence that such 'defect' could make no difference in the operation or control of this vehicle, or cause an accident in any manner.

"As a matter of fact, the record here is such that two equally reasonably [sic] inferences may be drawn concerning the cause of the accident. On the one hand, the accident may have resulted by the manner in which plaintiff himself operated the vehicle (it having been shown by pleadings, testimony and physical damage evidence that the truck was suddenly braked at a high rate of speed). Plaintiff would *prefer* to *infer* that the alleged mechanical defect was the cause."

8. The following is from the opinion in Ballenger:
"It is well settled under our decisions that when a peremptory instruction is requested on behalf of either party, then

When the dispositive issue is causation, the above stated principle is especially applicable. In the recent case of Mississippi Power & Light Company v. Walters (Miss.1963), 158 So.2d 2, the Mississippi Supreme Court stated the rule as follows:

> "Moreover, when reasonable minds might differ on the matter, the question of what is the proximate cause of an injury is usually a question for the jury, * * *.
>
> * * * * * *
>
> "There may be more than one proximate cause of an injury, * * * and if appellant's negligence proximately *contributed* to the injury, * * * then appellant is liable even though its negligence was not the sole proximate cause thereof." (Emphasis added.)[9]

Applying these principles outlined to the case under consideration, we believe the plaintiff presented sufficient evidence to support a jury verdict determining that the defect in question at least contributed to the injury. Of course we make no suggestion as to what the jury might have decided, or should decide, or what we would have decided from all the evidence. We only determine that the jury should have been given an opportunity to make a decision one way or the other. On this aspect of the case, we conclude that the court erred in taking the case from the jury.

It is difficult to determine whether the trial judge meant to find that there was not sufficient evidence of negligence presented to make a jury case, or whether having found a lack of causation, he looked no further. At any rate, it is our opinion that sufficient evidence was adduced to take the case to the jury under the *res ipsa loquitur* doctrine. In Johnson v. Coca-Cola Bottling Co. (1960), 239 Miss. 759, 125 So.2d 537, the Mississippi Supreme Court had occasion to say:

> "It has been repeatedly held that the 'exclusive control' mentioned in the foregoing definition means that the manufacturer or other defendant sought to be charged with negligence under the doctrine of *res ipsa loquitur*, is only required to have control of the instrumentality at the time of the *negligent act* which gives rise to the injury and not necessarily at the time of the accident to the plaintiff." [10]

Moreover, we reject the argument of Chrysler that the defect was patent and agree with the trial court that "it was a latent defect and one that the average member of the general public wouldn't be expected or called on to detect." The evidence does not show that Necaise's duties under his employment with the Navy required him to inspect the "U" bolts. In any event we believe it would be an intolerable burden to place on the user of a new vehicle to require him to inspect the numerous bolts and nuts which hold the vehicle together. If so, the manufacturer should give some cautious warning to that effect. To hold otherwise would be a promiscuous fallacy.

Under the requirements of the Erie [11] doctrine, we must seek to make "an enlightened guess" as to the law of Mississippi on the question of privity of

all of the evidence and all reasonable inferences that may be drawn therefrom are to be taken as true against the party on whose behalf a peremptory charge is asked. Long v. Patterson, 198 Miss. 554, 22 So.2d 490; Allgood v. United Gas Corporation, 204 Miss. 94, 37 So.2d 12; Thomas v. Mississippi Products [Co.,] Inc., 208 Miss. 506, 44 So.2d 556; Richardson v. Liddell, 222 Miss. 172, 75 So.2d 468; Mock v. Natchez Garden Club, 230 Miss. 377, 92 So.2d 562; Buntyn v. Robinson, 233 Miss. 360, 102 So.2d 126. See also Stricklin v. Harvey, 181 Miss. 606, 179 So. 345, and the cases therein cited."

9. See Note 7, supra.

10. See Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887, and annotation at p. 905.

11. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

contract,[12] taking our guidance and illumination from the Mississippi cases on the subject. Chrysler relies on its warranty which provides for the rather feeble and delusive right of replacement of defective parts at the factory, and even that right is to be limited strictly to the original purchaser. As to Necaise, Chrysler seeks to shelter itself with complete immunity from liability because of a lack of privity.[13]

The Mississippi case of Ford Motor Co. v. Myers (1928), 151 Miss. 73, 117 So. 362, and earlier Mississippi cases, held that there was no liability where the injured party, a remote vendee, could not establish privity with the defendant manufacturer of the defective instrumentality. The plaintiff points to a much later case, E. I. Du Pont De Nemours & Co. v. Ladner (1954), 221 Miss. 378, 73 So.2d 249, and contends that it impliedly overrules the Ford case.[14] In response to the plaintiff's contention as to the meaning of the Du Pont case, Chrysler relies heavily on the more recent decision of Harrist v. Spencer-Harris Tool Co. (1962), 244 Miss. 84, 140 So.2d 558, wherein the court noted its keen awareness of the dictum in Du Pont and its consciousness of the suggestion of Judge Magruder in

the case of Mason v. American Emery Wheel Works (1st Cir. 1957), 241 F.2d 906. The Harrist case fails to furnish us as much illumination as it seems to furnish Chrysler because, regardless of what else the court may have said, it finally concluded:

"We find, however, that it is not necessary *to pass upon or disturb* the former opinions of this Court in order to reach a decision in this case." (Emphasis added.)

Thus it seems to us that we are left with the dictum in Du Pont.

We are not critical of the decision of the Mississippi Supreme Court in Ford rendered thirty-six years ago. When that decision was rendered the often mentioned "population explosion" was not a concept. At that time the age of limitless gadgets and appliances, currently used by almost everyone, had not been born. And now, thirty-six years later, mechanical devices and appliances touch the very vitals of society. As a result of enticing advertisements, a constant barrage of reassurances, and a continuous flow of attractive invitations to purchase, millions of people acquire and live close to moving machinery almost constantly. The two-car family is com-

---

12. See Conn. Gen. Life Insurance Co. v. Breslin (5th Cir. 1964) 332 F.2d 928.

13. The only warranty contract shown by the record is Exhibit D-6 of the defendant entitled "Automobile Manufacturers Association UNIFORM WARRANTY" by which it warrants the vehicle to be free from defects in material and workmanship under normal use and service. The obligation of the warranty is limited to making good at the factory any parts, equipment, or certain trade accessories disclosed to have been defective to the satisfaction of the manufacturer within 90 days after delivery or before the vehicle has been driven 4,000 miles, whichever event shall first occur and the warranty is limited "to the original purchaser."

14. This view is supported by some commentators. 28 Miss.L.J. 250, 252 (1957).

The statement of the court in Du Pont on which Necaise relies is:

"Whatever the rule may have been originally, the principle seems now to be well established by the decisions of the many courts that a person who has had no direct contractual relations with a manufacturer may nevertheless recover from such manufacturer for damages to property caused by the negligence of the manufacturer in the same manner that such a remote vendee or other third person can recover for personal injuries.

" 'The modern doctrine may be regarded as allowing recovery for injury or damage to property in all instances where a case in Tort Law of negligence can be made out against the manufacturer—that is, where the requisite elements of foreseeability and breach of duty are established, where the manufacturer can be found to have been negligent, and such negligence was the proximate cause of the property damage.' "

monplace and there are literally millions of motor vehicles on the thoroughfares. Even with careful handling and operation, the record as to personal injuries is bad. Mechanical defects resulting from negligence cannot be tolerated. We do not speak of perfection, we only condemn negligence. Manufacturers of such powerful machinery are not insurers, but they should not be permitted to escape liability when they place on the market a defective motor vehicle, if the defect could have been avoided by the use of reasonable care. Since the famous case of MacPherson v. Buick Motor Co. (1916), 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, the immunity of manufacturers has been undermined and eroded. Numerous exceptions have been established by the development of the law. To mention only a few, many courts no longer require privity when recovery is sought for negligence, instrumentalities that are inherently and imminently dangerous have been removed from the operation of the doctrine of no liability, and immunity based on privity is not allowed where the injury comes from food products. At this late date most courts will not permit manufacturers to hide behind a contractual carapace shielding them from liability for harm caused by powerful and swift, but defective machinery. The citadel of immunity and privity has crumbled to some extent before the transcendent importance of life and health, and those principles of tort law designed to elevate such values.

A strong argument could be made on behalf of Necaise to exempt him from the strict legal requirements of technical privity. In a broad general sense, the Navy is a department or agency of the federal government. It, like other agencies or governmental departments, can function only through agents, servants, or employees. Everyone is aware of this fact and so was Chrysler at the time of the sale in question.[15] Current authorities are reluctant to insist upon the strict requirements of contractual privity in cases where the manufacturer of a chattel fails to exercise reasonable care in its manufacture and neglects to recognize as he should, that a dangerous risk is involved, which may bring substantial injury to those whom the manufacturer should reasonably expect to use the chattel, or be in the vicinity of its probable use.[16] In analyzing a negligence claim arising in the State of Alabama where the law is clear to the effect that there can be no action on implied warranty in the absence of privity of contract, this Court in Blitzstein v. Ford Motor Company (5th Cir. 1961), 288 F.2d 738, approved the following statement by the trial court:

"However, in turning to the facts in this case, I think that we deal with the general proposition that one who supplied directly or through a third party a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier knows, or from facts known to him should realize that the chattel

---

15. See annotation, Products Liability— Privity, 75 A.L.R.2d § 10, page 68, wherein it is stated:

"When it appears that an employer is in privity of contract with the manufacturer or seller of a product, and that the product has caused injury to an employee, there is room for argument that the employee should be viewed as standing in the shoes of the employer and thus beyond the reach of the general rule requiring privity in breach of warranty actions arising out of product-caused injuries."

16. *Restatement, Torts* (1960):

"A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured."

is or likely to be dangerous for the use for which it is supplied and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and fails to exercise reasonable care to inform them of its dangerous condition, or of the facts which make it likely to be so."

To the same effect is our recent case of Ford Motor Co. v. Mathis (5th Cir. 1963), 322 F.2d 267:

"A brand new automobile bearing down a highway in the dark of night with a dimmer switch so defective as to plunge the driver in total, sudden, unpredicted darkness is indeed 'dangerous' both to those in it and those within its range. On all tests it is 'dangerous' and the risk of injury is an unreasonable one. A manufacturer or assembler who produces such an article as a result of negligent manufacture and sells it to one clearly within the range of persons expected to use it owes a legal duty to such person to use reasonable care to prevent injury to him. This duty is not created by contract, but arises from the general duty not to injure another through disregard for his safety. The standard of reasonable care is commensurate with the risk of danger involv-

ed should there be a defective product."

In following the mandate of Erie and considering specifically the law of Mississippi, we are aided in the determination of that law by two decisions which have considered the question before. Mason v. American Emery Wheel Works, supra, and Grey v. Hayes-Sammons Chemical Co. (5th Cir. 1962), 310 F.2d 291.[17] In Mason the plaintiff was an employee of a subvendee of the defendant manufacturer and was injured by the disintegration of an emery wheel. The plaintiff, a Mississippi citizen, sued the corporate manufacturer in the U. S. District Court of Rhode Island for alleged injuries suffered when the wheel shattered while the plaintiff was using it on the job in the State of Mississippi. The District Court apparently concluded that the Du Pont decision had not changed the law as stated in Ford, and felt bound to apply the rule announced in the Ford decision. The District Court was overruled. The Court of Appeals of the First Circuit reasoned that the Supreme Court of Mississippi would not adhere to its strict rule in the Ford case in view of the later development of the law. Decisions that are out of step with the times may fall by attrition, erosion, undermining, and by inroads and exceptions to the harsh application of a technical rule.[18]

---

17. Perhaps of no legal significance, it should be noted that the Harrist case was decided by the Supreme Court of Mississippi on May 7, 1962, and the Grey case was decided by this court on November 7, 1962, some six months later. The Harrist case is not cited in Grey.

18. The following is from Judge Magruder's opinion:
"MacPherson v. Buick Motor Co., supra, started a new trend in this particular field of the law, and its substantive result has found favor in § 395 of the American Law Institute Restatement of Torts. If the Supreme Court of Mississippi had recently reconsidered the rule it applied in Ford Motor Co. v. Myers, supra [151 Miss. 73, 117 So. 362], and had decided to adhere to it on the ground of stare decisis, no doubt the federal courts would have had to ac-

cept the local law as so declared. But it would be gratuitous and unwarranted to assume that the Supreme Court of Mississippi would now so hold, when we bear in mind the readiness of other courts, in conservative jurisdictions at that, to overrule their earlier holdings and to bring their jurisprudence into accord with what is now the overwhelming weight of authority.

*    *    *    *    *

"Of course it is not necessary that a case be explicitly overruled in order to lose its persuasive force as an indication of what the law is. A decision may become so overloaded with illogical exceptions that by erosion of time it may lose its persuasive or binding force even in the inferior courts of the same jurisdiction. And where, as in Ford Motor Co. v. Myers, the Supreme Court of Mississippi, twenty or thirty years ago, ap-

In Grey this Court followed the First Circuit, approved the reasoning in Mason, and concluded:

> "It is, of course, unusual for a federal court to base an Erie decision on pure dicta in preference to a firm holding to the contrary. But we agree with the First Circuit. We must decide the case as if we were sitting as a Mississippi court. The court's strong language in E. I. du Pont de Nemours & Co. v. Ladner, the reference to recent authorities, and the court's consciousness of the fact that its discussion of the 'modern doctrine' was not necessary to the decision, compel us to say that the Mississippi Supreme Court was putting litigants on notice that it no longer considered Ford Motor Co. v. Myers to be the law of Mississippi.
>
> \*   \*   \*   \*   \*   \*
>
> "Under Mississippi law, as we read E. I. du Pont de Nemours & Co. v. Ladner and as the First Circuit held, privity is not required when the action is against the manufacturer for breach of his duty of due care."

In addition to the foregoing, there are ample reasons to distinguish the Mississippi Ford decision from the instant case. In Ford, the injured party was a remote vendee of the vehicle involved. Ownership and possession had been acquired through several purchasers. The Court did not rely upon the privity rule exclusively. The claimant in Ford contended that an automobile would become highly dangerous when put to the uses for which it was intended, because of defects in its manufacture, and that the manufacturer owed the public a duty irrespective of any contractual relation to use reasonable care in the manufacture of the vehicle. The Court stated:

> "If an automobile was a dangerous instrumentality per se, there would be more reason to follow the position of appellees. But our court held, in Vicksburg Gas Co. v. Ferguson, 140 Miss. 543, 106 So. 258, that an automobile was not such an instrumentality."

The Vicksburg Gas case upon which the Court relied is now almost forty years old. The construction and horsepower of motor vehicles have changed. High-speed expressways are in existence. The number of vehicles has multiplied beyond the 1925 imagination. Many types of vehicles, undreamed of forty years ago, have reached enormous numerical proportions. It is difficult for us to conclude that the Supreme Court of Mississippi would now hold that a *defective* automo-

---

plied an old rule which has since been generally discredited elsewhere, it is relevant to consider what the Supreme Court of Mississippi has subsequently said on the point. See 'Note on the Ways of Ascertaining State Law,' Hart & Wechsler, The Federal Courts and the Federal System 628–30 (1953). We think that appellant herein rightly stresses the importance of E. I. Du Pont De Nemours & Co. v. Ladner, 1954, 221 Miss. 378, 73 So.2d 249. In that very recent case, the Supreme Court of Mississippi was able to dispose of the particular issue on another ground without the necessity of expressly overruling its earlier decision in Ford Motor Co. v. Myers. But the court did take occasion, in a long and careful opinion, to indicate its awareness of the modern trend in the area, including the decision of the Supreme Judicial Court of Mas-

sachusetts in Carter v. Yardley & Co., supra [319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559]; it stated that, whatever may have been the rule originally, 'the principle seems now to be well established by the decisions of many courts that a person who has had no direct contractual relations with a manufacturer may nevertheless recover from such manufacturer for damages to property caused by the negligence of the manufacturer in the same manner that such a remote vendee or other third person can recover for personal injuries.' 73 So.2d at page 254. And it quoted, with apparent approval, many more recent authorities in support of the 'modern doctrine.' (Ibid.) We think it is fair to infer from this latest expression by the Supreme Court of Mississippi that it is prepared to reconsider and revise the rule it applied in Ford Motor Co. v.

bile is not a dangerous instrumentality per se.[19]

The judgment is reversed and the case is remanded for a new trial in accordance with the views herein expressed.

Myers whenever it may have before it a case that squarely presents the issue. We have no doubt that when this occasion does come to pass, the Supreme Court of Mississippi will declare itself in agreement with the more enlightened and generally accepted modern doctrine."

19. See Footnote 7 supra.